THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BERNARD K. MARCUS and Others, Appellants, Impleaded with HENRY W. POLLOCK and Another, Defendants.

First Department, May 20, 1932.

*Charles H. Tuttle*, for the appellant Bernard K. Marcus.

*Nathan L. Miller* of counsel [*Harold H. Corbin* and *Edward J. Bennett* with him on the brief; *Hornblower, Miller, Miller & Boston*, attorneys], for the appellant Saul Singer.

*Harold R. Medina*, for the appellant Herbert Singer.

*Robert C. Taylor, Assistant District Attorney*, of counsel [*LeRoy Mandle* with him on the brief; *Thomas C. T. Crain, District Attorney*], for the respondent.

TOWNLEY, J. Section 305 of the Penal Law (added by Laws of 1913, chap. 102), so far as applicable, reads as follows: " Any officer, director, trustee, employee or agent of any corporation to which the Banking Law is applicable, who abstracts or wilfully misapplies any of the money, funds or property of such corporation, or wilfully misapplies its credit, is guilty of a felony."

The defendants Marcus and Saul Singer were directors of the Municipal Safe Deposit Company, a subsidiary of the Bank of United States, and the defendant Herbert Singer was an attorney in the office of Isidor J. Kresel, the general counsel of the Bank of United States and its subsidiaries.

The indictment upon which these defendants were tried charged that the defendants Marcus and Saul Singer, " feloniously did abstract and wilfully misapply the money, funds and property of the said corporation called Municipal Safe Deposit Company by wilfully and feloniously procuring and causing and wilfully and feloniously concurring in procuring and causing the said corporation called Municipal Safe Deposit Company to pay to a certain other corporation called Bolivar Development Corporation the sum of $2,009,518.45 to enable the said corporation called Municipal Safe Deposit Company to purchase, acquire and hold for its own, twenty-five shares of the stock of another corporation called Premier Development Corporation." The defendant Herbert Singer was charged in the indictment with aiding and abetting the crime of the defendants Marcus and Saul Singer.

The sufficiency of the indictment has been challenged upon this appeal. The substantial basis of the attack upon it is that, while the opening part charges a violation of section 305 in the language of the statute, the statement of the facts constituting the violation of the section does not establish the crime charged and does not contain " a plain and concise statement of the act constituting the crime * * *," as required by section 275 of the Code of Criminal Procedure. The specific objection made is that the only facts stated are that the defendants caused the Municipal Safe Deposit Company to purchase stock of the Premier Development

Corporation and pay therefor the sum of $2,009,518.45. This, it is said, states no crime, because the Municipal Safe Deposit Company did have the right to purchase stock in another corporation for corporate purposes. Further facts necessary to make such purchase a violation of section 305 of the Penal Law, it is urged, must be stated.

At common law a corporation had no right to purchase and deal in stocks of another corporation unless expressly authorized by law. (*Holmes & Griggs Mfg. Co.* v. *Holmes & Wessell Metal Co.,* 127 N. Y. 252, 257.) The Municipal Safe Deposit Company was subject to the provisions of the Banking Law and as such had no power to purchase the stock of another corporation except for its own corporate purposes. (Gen. Corp. Law, § 14, subd. 3; Stock Corp. Law, § 18, as amd. by Laws of 1929, chap. 326.) There was considerable controversy on the trial as to the rights of this company to purchase the stock of another corporation, the People contending that it had no power to purchase stock under any circumstances, and the defendants that it had general power to make such purchase. Upon this appeal, however, it is conceded by the People that this corporation had the power under section 14, subdivision 3, of the General Corporation Law to purchase stock for its corporate purposes.

The indictment charges in terms that the defendants misapplied the funds of the Municipal Safe Deposit Company in making such purchase. This is the equivalent of an allegation that the purchase was not made for corporate purposes. The indictment thus sufficiently states, in the language of the statute, the charge made against the defendants, and also identifies the transaction upon which the charge is based.

The defendants never had, and never claimed to have, any uncertainty as to the offense with which they were charged. Nearly a hundred pages of this record are taken up by discussion and argument in connection with the motion made to dismiss the indictment after a jury had been impanelled. The court made no express ruling upon the motion until the conclusion of the case and the trial went on without confusion and without indication of any uncertainty as to the charge upon which the defendants were being tried. The criticism of this indictment made upon the trial and repeated on this appeal is highly technical and of a character which the Court of Appeals has frequently held would not justify the reversal of a judgment of conviction except upon proof of definite prejudice to the defendants resulting therefrom. The test to be applied in determining the sufficiency of an indictment was recently stated by the Court of Appeals in *People* v. *Farson*

(244 N. Y. 413). The court in its opinion said: " The indictment is sufficient if it identifies the charge against the defendant so that his conviction or acquittal may prevent a subsequent charge for the same offense; notifies him of the nature and character of the crime charged against him to the end that he may prepare his defense; and enables the court upon conviction to pronounce judgment according to the right of the case." This test was again stated in *People* v. *Bogdanoff* (254 N. Y. 16, 32). The court said, speaking of the common-law form and short form of indictments: " Whatever form is used, an indictment must still remain a written accusation of a crime by the grand jury. Reasonably precise formulation should render it unnecessary to resort to extraneous proof, yet a faulty formulation of an indictment cannot require a reversal of a conviction unless there is doubt as to the meaning of the indictment."

.The indictment in this case clearly meets all of the requirements as stated in the above cited cases. The trial of the case was very protracted, occupying approximately ten weeks of the court's time. The record on appeal contains many thousand pages of testimony. To allow a highly technical objection to the indictment to destroy the results of such a trial would be to sacrifice substance to form, and abandon much that has been accomplished to simplify procedure upon criminal trials. We are convinced that this indictment sufficiently informed the defendants and the court of the charge made and that no substantial prejudice resulted from its form.

The second error assigned by the appellants is that the trial justice misinterpreted the meaning of section 305 of the Penal Law. The court ruled that " wilfully misapplies " was equivalent to voluntarily doing the act charged and, therefore, permitted no defense to the effect that the act charged was done in good faith. It is contended that the word " misapply " implies an improper intention. Accordingly, it is said that a criminal intent must be proven as an essential element in the crime. This section of the Penal Law is copied in part from section 5209 of the United States Revised Statutes (U. S. C. A. tit. 12, § 592). Section 5209, however, contains the words: " who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of such Federal reserve bank or member bank * * * with intent * * * to injure or defraud such Federal reserve bank or member bank, or any other company, body politic or corporate, or any individual person * * *."

The Legislature in formulating section 305 left out the word " embezzles " and the phrase " with intent * * * to injure or defraud," and changed the penalty from that of a misdemeanor

to a felony. This distinction makes the cases in the Federal court cited by appellants in construing section 5209 of the United States Revised Statutes inapplicable. The purpose of the Legislature in passing section 305 is clear. They intended to make the prohibition against misapplication of corporation funds absolute, provided it was willfully done. They did not intend that the good or the bad motives of the officers concerned in such misapplication should be an element of the crime. To read into this section the necessity of establishing criminal intent in the ordinary accepted sense would destroy in a large measure the efficiency of the statute by permitting the answer of good faith completely to excuse those involved in such misapplication. The Court of Appeals (*People* v. *Harrison*, 238 N. Y. 348), in construing section 751, subdivision 12, of the Penal Law, which makes it a crime for an election officer to willfully make " a false statement of the result of a canvass of the ballots cast thereat," in its opinion (at p. 351) said: " Penal Law, section 751, subdivision 12, clearly uses the word ' wilfully ' in connection with all the acts therein made criminal. The word ' wilfully ' as used in that connection, alone and not in connection with the word ' maliciously ' as in *Wass* v. *Stephens* (128 N. Y. 123, 128), means ' intentionally and by design ' as distinguished from ' maliciously or wantonly.' (*People* v. *Marrin*, 205 N. Y. 275, 279; *People* v. *Foster*, 204 App. Div. 295; affd., 236 N. Y. 610.) The lack of a bad motive or of a design to injure some one is no defense under the statute, but the burden is on the People to show that the act of making a false statement was intentional." The trial court in this case applied this definition of " willful " consistently throughout the trial and in its charge.

It is claimed that the court, in spite of the construction placed upon this statute by it, permitted the introduction of a great mass of testimony which could be material only on the question of intent and which was most prejudicial to the defendants. This testimony was not received by the trial court upon the question of intent in the sense of showing criminal intent as commonly understood. This evidence was expressly restricted to the question of whether or not the act of the defendants constituted a willful misapplication of the funds of the safe deposit company. The complicated character of the transactions in the purchase of the stock justified a full investigation of the entire transaction. This necessarily included an examination of the financial ventures of the defendants which are claimed to have been responsible for the indebtedness sought to be concealed by the transactions involved herein. The proof was not only proper but necessary in order to negative the

possibility that this purchase of stock was undertaken for the corporate purposes of the safe deposit company. The court in its charge expressly limited the application of the testimony to that purpose. It not only so stated in its original charge, but restated it when the jury returned for further instructions. Its attitude on this subject was consistent and clear throughout the entire trial. The complaint made by the defendants that testimony was received to prove the existence of bad faith on their part, and that they were deprived of their opportunity to show their good intention and advice of counsel is baseless considered in the light of the true theory of the case.

Defendants Marcus and Saul Singer had been interested in a syndicate operating for their personal profit to maintain the price of units of bank stock and Bankus Corporation stock. The syndicate became involved and through the control which Marcus and Saul Singer exercised over the subsidiaries of the Bank of United States, the obligations of the syndicate in part were transferred to three finance companies. These finance companies were affiliated subsidiaries, the stock of which was almost entirely owned by the Bank of United States. Six months prior to the transaction complained of, the indebtedness of these finance companies to the Bank of United States amounted to less than $4,000,000, but the Superintendent of Banks had none the less criticised the loans as being too high. In the following six months, however, in spite of this criticism, the indebtedness of the finance companies to the Bank of United States had been increased through the assumption of syndicate obligations to $12,000,000. To make an apparent reduction in these loans, defendants arranged to transfer them to three safe deposit companies, also subsidiaries of the bank, one of which was the Municipal Safe Deposit Company. To carry out this arrangement, two corporations which had been incorporated by counsel for the bank and which had no assets were used. These corporations were the Premier Development Corporation and the Bolivar Development Corporation.

The form which the transaction took was as follows: The finance companies sold assets having a book value of approximately $5,000,000 to the Premier Development Corporation and received in exchange all of the capital stock of that company. They then sold this stock to the Bolivar Development Corporation for $5,000,000. The Bolivar Development Corporation reappraised the stock, divided it into three parcels, and sold them to the three safe deposit companies for a total of $8,000,000. The safe deposit companies simultaneously borrowed $8,000,000 from the Bank of United States and paid it to the Bolivar Development Corporation

for this stock. The Bolivar Development Corporation paid $5,000,000 to the finance companies for the Premier stock and loaned Bankus Corporation, one of the finance companies, the remaining $3,000,000 on its unsecured note. The three finance companies then paid the $8,000,000 back to the Bank of United States in reduction of their loans.

The purely arbitrary appraisal of this stock by the defendants, in which its value was increased from $5,000,000 to $8,000,000, resulted in the Bolivar Development Corporation realizing a profit of $3,000,000. The Bolivar Development Corporation was wholly owned by the defendant Herbert Singer. While this $3,000,000 had been loaned to the Bankus Corporation and the entire transaction might have been rescinded within one year, the fact remains that if it were not rescinded the Bolivar Development Corporation could collect $3,000,000 from the Bankus Corporation. The control of this loan by the defendant Herbert Singer created a situation of grave danger to the stockholders of the Bank of United States and exposed these defendants to considerable temptation.

As its share in this transaction, the Municipal Safe Deposit Company borrowed from the Bank of United States $2,009,518.45, for which it had no use in the exercise of its ordinary corporate business. The defendants had moreover caused it to pay this sum for stock which, under these circumstances, it had no power to buy and which had been arbitrarily raised in value that very day by the defendants. The entire transaction was carried out after business hours. No meetings of the corporations involved were actually held. The officers of some of the corporations refused to sign the papers. The check of the Colonial Safe Deposit Company for $3,000,000 was put through with the single signature of Marcus contrary to the by-laws because the treasurer of that company refused to sign it. It would be difficult to imagine a clearer case of misapplication of corporate funds. No one can defend this transaction and no one has seriously undertaken to do so. It is said, however, that the act of the Municipal Safe Deposit Company was merely *ultra vires* and not criminal. *Ultra vires* it undoubtedly was, but section 305 of the Penal Law also makes it a crime.

There are many alleged errors claimed to have occurred during the course of this trial. These errors, however, are immaterial and may be disregarded in view of the fact that the transaction pleaded in the indictment was admitted. The only issues of fact attempted to be litigated by the defendants were with regard to the alleged refusal to disapprove of the project on the part of the Superintendent of Banks and the advice which defendants said

they had received from counsel as to the legality and propriety of the transaction. Under the statute as we construe it neither of these questions is material either as a defense or in mitigation of the crime charged. (*People* v. *Weed*, 29 Hun, 628; affd., 96 N. Y. 625.) Any error committed in connection with either of these immaterial issues is to be disregarded under section 542 of the Code of Criminal Procedure. (See, also, *People* v. *Montforte*, 256 N. Y. 159, 162; *People* v. *Warder*, 231 App. Div. 215; *Williams* v. *B. E. R. R. Co.*, 126 N. Y. 96, 103.) This disposes of the questions arising on the cross-examination of Mr. Kresel, on the examination of the Superintendent of Banks, on the Egbert memorandum, and on the references to the refusals of Marcus and Saul Singer to testify before the grand jury and other minor points. A more detailed discussion of these errors would extend this opinion beyond reasonable limits and would serve no useful purpose.

A special plea is made on behalf of the defendant Herbert Singer who was charged with aiding and abetting the commission of this crime. While in one sense he was merely the law clerk of the general counsel and as such only carried out his orders, he did claim to have at least in part invented this scheme and he lent himself to its practical carrying out by personally purchasing all the stock in Bolivar Development Corporation. His participation in the transaction, therefore, cannot fairly be considered to have been that of a passive employee either of the bank or of Mr. Kresel. The question of his guilt or innocence was properly left to the jury and the jury was sufficiently instructed concerning the evidence relating specially to him.

The judgment of conviction against all three defendants should be affirmed.

FINCH, P. J., MERRELL and McAVOY, JJ., concur; MARTIN, J., dissents and votes for reversal and dismissal of the indictment.

MARTIN, J. (dissenting). The Municipal Safe Deposit Company, on January 13, 1930, obtained a credit of $2,009,518.45 at the Bank of United States by executing a four months' note for such amount to the bank, and on that day a check for the same amount was drawn by the Municipal Safe Deposit Company upon the Bank of United States to the order of Bolivar Development Corporation.

On the face of the check appeared the legend " Purchase of 25 shares of Premier Development Corp." The check was signed by Ralph Henderson, secretary, and Henry W. Pollock, treasurer. The back of the check is indorsed " Bolivar Development Corp." and stamped " Paid 1/13/30." A deposit slip shows that the

amount of this check was credited on January 13, 1930, to the Bolivar Development Corporation in account with the Bank of United States. This appears also from a statement of the Bolivar Development Corporation's account with the Bank of United States as of January 13, 1930.

The Premier Development Corporation on the same day issued its stock certificate certifying that Municipal Safe Deposit Company was the owner of twenty-five shares of its capital stock.

The appellants Bernard K. Marcus, Saul Singer and Herbert Singer, directors of the Municipal Safe Deposit Company, knew of these transactions and participated in them. They were indicted and convicted therefor, the indictment charging them with the crime of abstracting and willfully misapplying, as directors, the money, funds and property of a corporation to which the Banking Law of the State of New York is applicable. (Penal Law, § 305.)

It is impossible in a few pages adequately to consider the many important questions here involved. A few only will be discussed in this opinion.

Shortly after the appellants were convicted, the late Mr. Justice Mullan at Special Term, Supreme Court, New York county, in granting a certificate of reasonable doubt set forth in an opinion a number of substantial reasons for the issuance of such a certificate. He said: " Contrary to popular belief, the indictment in this case does not charge the defendants with any crime which relates to their actions as officers or directors of the bank. It alleges that they, as officers and directors of a certain safe deposit company, ' abstracted and willfully misapplied the money, funds and property of the said safe deposit company.' It alleges that this was done by the defendants causing the safe deposit company to pay to Bolivar Company over two million dollars for the purchase price of certain stock of Premier Company, and that they abstracted the money and willfully misapplied it. There is no allegation of what the stock purchased was worth. The indictment is drawn to cover the crime specified in Penal Law 305. That section has never been construed in the courts of this State. The Federal statute upon which it is modeled is not couched in exactly the same words, and the decisions in the Federal courts are based upon words not in our statute. It would, therefore, seem that the point here raised concerning the validity of the indictment has never been passed upon by any court, other than the trial court here." (N. Y. L. J. July 23, 1931.)

The papers on appeal justify the doubts expressed by Mr. Justice Mullan as to the validity of the convictions.

Despite the enormous record which has been presented to this

court, consisting of eleven volumes of 6,470 pages, and which the district attorney in his brief has properly characterized as " appalling," the substance of the whole controversy and the contentions of the respective parties may be summarized in the following short excerpts taken from the charge of the court to the jury: " In other words, the matter set forth in the indictment might be compared to a branch of a large tree which could not have sprung into existence except for the nutriment and strength obtained from the root and trunk of the tree, and therefore the People have endeavored by their proof to give a picture of all the multifarious matters which finally resulted in the transaction for which these defendants are being prosecuted, in an endeavor to prove to you that what the defendants are alleged to have done on January 13, 1930, in the matter of the purchase of the 25 shares of Premier stock was done intentionally and by design, instead of being the result of inadvertence."

The court was familiar with the contentions of the defendants, for they are stated in the following language: " Now, the defendants contend that they did not wilfully misapply the funds of the safe deposit company for they say that the said 25 shares of the Premier Development stock in their judgment was worth the amount paid for them, and that it was an honest transaction, and that they acted under the advice of counsel, and without objections by the State Superintendent of Banks, and that by reason of the said transaction, the Bank of United States lost nothing, and that it was paid with its own money, and that it was merely shifting the indebtedness from the finance companies to the safe deposit companies, and that it was merely a bookkeeping transaction, and that all the finance companies and the safe deposit companies were wholly owned by the Bank of United States."

Other excerpts from the court's charge further indicate the theory upon which the case was submitted to the jury. The court said: " They are not on trial as officers of the Bank of United States. The issue involved in the indictment, under which they are being prosecuted, is a very simple one, although the case ·itself has taken a great length of time to try. The issue is whether they wilfully misapplied the funds, not the credit, of the Municipal Safe Deposit Company."

" The defendants are not charged with the larceny of the said money, and it is not necessary for you to find that they individually benefitted from the use of the said money. Self-enrichment or personal profit is not an element of the crime."

These latter statements were concurred in by the prosecuting attorney, for he stated: " There is no pretence, or a suggestion, or

a claim that Marcus and Singer or any other individual took a two-cent piece.   Now, is that clear enough? "

As pointed out by the Special Term, important questions relating to the criminal law and procedure have been raised by the parties to this litigation, which questions, because of their far-reaching effect, require consideration.   *The basic question broadly stated is, whether the directors of a moneyed corporation may be convicted of a crime, if they, in good faith, and with honest motives, and upon legal advice, carry out a commercial transaction which they believe to be in all respects, proper and lawful.*

We must first consider the conflicting theories of the prosecution upon which the case was presented to the jury and upon which the prosecution seeks to sustain the convictions upon appeal.

The People were bound to take a definite stand upon the questions involved.   If the proposition was that a safe deposit company may not purchase stock of another corporation, then the case was tried on an erroneous theory, for the district attorney upon this appeal says " that has nothing to do with the case," although that is the charge set forth in the indictment as constituting the willful mis-application of funds.

To support the contention of the appellants that a contradictory and inconsistent position was taken by counsel at the trial, counsel on this appeal, and the court, the following statements are quoted from the record: " The Court: Let me ask you this question.   If a safe deposit company is authorized to purchase stock, then do you still contend your indictment is good?   Mr. Steuer: No.   I am going to be perfectly frank with you.   If a safe deposit company has the right indiscriminately to purchase stock, this indictment is bad from A to Z and charges nothing.   But I say that a moneyed corporation is inhibited from purchasing stock, and that unless they can come in and show that here, that they have special powers conferred upon them, or they can show that this comes within some exception, that is for them to establish and not for us to plead."

" The Court: I think that whole question turns on that one question, whether or not the safe deposit company could purchase any stock.   Mr. Steuer: Whether it was not inhibited?   The Court: Yes."

" The Court: In other words, your argument is that the safe deposit company is prohibited from buying stocks by virtue of section 18 of the Stock Corporation Law.   Mr. Steuer: Yes.   The Court: You base your argument on that?   Mr. Steuer: Absolutely we stand on that."

In contradiction of the above, the district attorney in his brief

submitted on this appeal states that the People *do not* contend that safe deposit companies lack power to make legitimate investments in stocks and bonds, and he does not appear to limit it to speculative purposes or otherwise, but says: " The People do not contend that Safe Deposit Companies lack power to make legitimate investments in stocks and bonds. *No such question* is involved in this case."

This latter statement shows an abandonment of the position taken upon the trial, is contrary to the court's charge, and was evidently made because *it has been discovered* that there is no prohibition against safe deposit companies purchasing stocks and bonds of other corporations. Furthermore, if there had been such a prohibition at the time of the purchase, it would not be a crime, unless it was made such by statute. On the above admission, it is difficult to see how the convictions based on the indictment, or upon the charge of the court that a safe deposit company " had no right to purchase stock of another corporation," can be sustained.

The court charged the jury on this subject as follows: " Being a moneyed corporation it had no right to purchase stock of another corporation for speculative purposes."

It nowhere appears just what the trial judge intended by " speculative purposes." Of course, all such purchases are, in a sense, for a speculative purpose as that term is generally used.

We are confronted with the very unusual situation that the trial counsel and the appeal counsel for the People disagree on the law and the theory on which the convictions were obtained. Trial counsel says: " If a safe deposit company has the right indiscriminately to purchase stock, this indictment is bad from A to Z and charges nothing." The appeal counsel says that has nothing to do with the case and that a safe deposit company may make such purchases.

If the purchase of stock, which is the basis for the indictment, was not prohibited, then the defendants were entitled to have the indictment dismissed. If, on the other hand, the crime charged was the willful misapplication of funds or property (assuming that the indictment was proper), the defendants would be entitled to have presented to the jury the question of intent, good faith and honest motives. As to this, evidence of the sincere reliance on the advice of counsel and the attitude of the Banking Department would be clearly admissible.

The appellants also contend that the indictment is defective and fails to charge any crime. The indictment, charging that the crime consisted of the purchase of stock by a safe deposit company, was very much limited by the allegations set forth therein for the

purpose of specifically showing the crime alleged to have been committed. If the facts stated do not constitute a crime, the indictment is bad. That is not a technical objection. It is substantial, going to the very basis of the case. To overcome that objection the district attorney now says that the indictment was drawn partly as a short-form indictment and partly in the old form and may be considered a short-form indictment. The appellants point out, however, that the indictment is neither a short-form nor a long-form indictment and clearly fails to comply with the essential requirements of any form of indictment.

There appears to be a well-founded assumption that whoever drew the indictment did so on the theory that the purchase of stock by a safe deposit company was prohibited by section 18 of the Stock Corporation Law, and was made a crime. As has already been pointed out, the assistant district attorney who argued the case on appeal abandoned that contention both in his brief and in the oral argument.

It is elementary that where the crime charged is burglary, manslaughter or robbery, or a similar crime, a mere statement in the indictment of the crime may be sufficient, but where the crime, as here charged, is the *willful misapplication of funds,* which is a term in general use, the indictment must show in what manner the funds were willfully misapplied as well as the facts constituting the crime, and facts showing a willful misapplication. (*Batchelor* v. *United States,* 156 U. S. 426; *United States* v. *Britton,* 107 id. 655; *People* v. *Corbalis,* 178 N. Y. 516; *People* v. *Devinny,* 227 id. 397, 402.)

In *Batchelor* v. *United States* (*supra,* 429) the rule is tersely stated that a charge of willful misapplication " * * * must be supplemented by further averments, showing how the misapplication was made, and that it was an unlawful one. Without such averments, there is no sufficient description of the exact offense with which the defendant is charged, so as to enable him to defend himself against it, or to plead an acquittal or conviction in bar of a future prosecution for the same cause." (See, also, *Evans* v. *United States,* 153 U. S. 584.)

The prosecution overlooks the fact that the indictment states in detail the acts which it relies upon to constitute a crime by the use of the words: " * * * by wilfully and feloniously procuring and causing and wilfully and feloniously concurring in procuring and causing the said corporation called Municipal Safe Deposit Company to pay to a certain other corporation called Bolivar Development Corporation the sum of $2,009,518.45 to enable the said corporation called Municipal Safe Deposit Company to

purchase, acquire and hold for its own, twenty-five shares of the stock of another corporation called Premier Development Corporation; * * *."

In view of the law and the admissions made *on appeal* by the prosecutor that a safe deposit company *may* purchase stock, an indictment which limits the charge to specific facts and alleges the purchase of stock only, is insufficient. It was necessary for the indictment to allege not only the purchase of the stock, but the fact or facts, if any, which made such purchase a crime. In other words, the mere allegation that stock was purchased was clearly insufficient. The burden was not upon the defendants, as has been contended, to show that they came within some exception. (*People* v. *Devinny, supra.*)

The defendants do not say they did not know the charge; they say that the facts set forth to constitute the crime did not charge a crime. If the indictment does not charge a crime, their knowledge of what was intended does not make the indictment good.

If the charging portion of the indictment undertakes to specifically state the facts which constitute the crime, and those facts do not constitute a crime, the indictment is defective.

There are other substantial grounds for reversal urged by the appellants. They say the prosecution failed to prove any crime and that neither moral turpitude nor evil intent was established.

The case eventually narrowed down to the charge that if the defendants knowingly conducted the transaction, they were guilty of a crime and could be convicted under section 305 of the Penal Law. To sustain the convictions, the People were bound to prove the defendants willfully misapplied the property, funds or credit of the safe deposit company. The appellants contend *that there was no misapplication of any property* or funds, and the court charged *there was no misapplication of credit.*

The State and Federal courts have frequently defined the words " willfully " and " misapply " and their necessary elements. Under the decisions defining these words, where the act is not a prohibited act in the sense that the doing of the act alone is a crime, essential elements are bad faith, criminal intent and dishonest motives. Therefore, good faith, honest motives and a legitimate purpose are important factors.

The court charged the jury: " Wilfully means intentionally and by design, as distinguished from maliciously and wantonly."

The trial court persisted in charging the jury that if the appellants *knowingly and with design* acted as they did, they could be convicted. In other words, if they knew what they were doing, they were guilty of a crime. The definition of " willfully " charged

by the trial court is not justified by the statute or the decisions. The law as stated in this case, therefore, was erroneously applied by the court.

The appellants admitted the transaction was carried out deliberately, but maintained that there was no wrongdoing intended; that the transaction was legal in all respects and was consummated with a good purpose and upon legal advice.

The statute does not provide that a purchase of stock by a moneyed corporation is a crime. In effect, it makes criminal the willful misapplication of funds of a moneyed corporation.

The charge of the court substantially stated that, if the transaction was done with full knowledge of the facts and circumstances, the appellants were guilty. The jury, after deliberating some time, asked the court to read the charge on this subject. In response, the court read portions of its charge and then summarized its interpretation of the statute as follows: " In other words, as I told you not only here but two or three more times, in the course of my charge I referred to the definition of 'wilfully' and 'misapply.' I stated to you ' wilfully ' means intentionally and by design. That means that the party doing the act does it with full knowledge of all the facts and circumstances;   *   *   *."

This charge was fundamentally wrong. The decisions are that merely because an act is done with knowledge of the facts and circumstances, moral turpitude, criminal intent or bad motives are not to be implied. It may be legal or it may be illegal, or it may be wrongful and *ultra vires*, but it is not a crime unless made so by statute.

In *Wass* v. *Stephens* (128 N. Y. 123, 128) the court said: " But the word ' wilfully ' in the statute means something more than a voluntary act, *and more also than an intentional act which in fact is wrongful.* It includes the idea of an act intentionally done with a wrongful purpose, or with a design to injure another, or one committed out of mere wantonness or lawlessness."

In *Hewitt* v. *Newburger* (141 N. Y. 538) the court cited the *Wass* case with approval and repeated its definition of " willfully."

In *People* v. *Baylinson* (211 App. Div. 40) this court said: " Willfulness implies an intent on the part of the wrongdoer. There is not the slightest evidence in the case that the defendant acted willfully or with wrongful intent. The absence of proof of any willful intent on the part of the defendant absolves him from guilt. (*People* v. *Foster*, 204 App. Div. 295; affd., 236 N. Y. 610; *People* v. *Marrin*, 205 id. 275; *People* v. *Martinitis*, 168 App. Div. 446.)   *   *   *   But this section of the Penal Law [§ 43] requires that the injuring act shall be *willful*. There must exist an intention

designedly and purposely to cause injury. Not every intentional act is willful. It must be with wrongful purpose, or with a design to injure another, or one committed out of mere wantonness or lawlessness."

In *Potter* v. *United States* (155 U. S. 438) the United States Supreme Court held that an officer of a National bank could not be convicted for *willfully* certifying a check drawn against insufficient funds, *unless the officer of the bank intended to do wrong.* The court (at pp. 446, 447) said: " The word ' wilful ' is omitted from the description of offenses in the latter part of this section.■ Its presence in the first cannot be regarded as mere surplusage; it means something. It implies on the part of the officer knowledge *and a purpose to do wrong.* * * *

" ' Doing or omitting to do a thing knowingly and wilfully implies not only a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it.' * * *

" While it is true that care must be taken not to weaken the wholesome provisions of the statute designed to protect depositors and stockholders against the wrongdoings of banking officials, it is of equal importance that they should not be so construed as to make transactions of such officials, carried on with the utmost honesty and in a sincere belief that no wrong was being done, criminal offences, and subjecting them to the severe punishments which may be imposed under those statutes."

In *People* v. *Boas* (29 Hun, 377; affd., 92 N. Y. 560) the word " willful " was defined as follows: " It must be further said that the section under which the defendant was indicted makes the exclusion of the vote a felony, and the general rule of law in regard to a felony is that there must be an intent to do wrong, and the intent must be proved beyond reasonable doubt. It is true that the inspectors are not invested with any discretion as to the rejection or acceptance of a vote, when the person offering it has the necessary qualifications authorizing him to express it; but the language of the statute is ' willful.' It is not that if they reject the vote of a person duly qualified they may be convicted, but they must do it willfully, and that means with knowledge aforethought, and with a wicked design. If this be not so then the word willful has no force in the statute, and might just as well be expunged."

In *United States* v. *Three Railroad Cars* (1 Abb. [U. S.] 196) the Federal court in construing the meaning of the word " willful " in a Federal statute said: " * * * when, as in this case, the act

must be *willfully* done to make it criminal, it can hardly be supposed that the Legislature intended to declare an act committed without any illegal or improper motive, and under the honest belief that it was entirely right and proper, to be a felony punishable, in the discretion of the court, by a large pecuniary fine and five years' imprisonment."

It is unnecessary to multiply authorities defining the word "willfully." They are numerous. The trial court refused to define the word "willful" or the word "willfully" as the courts have defined it on many occasions.

The People appear to rely on cases where prohibited acts alone were made a crime and cite as an authority the case of *People* v. *Harrison* (238 N. Y. 348). There the crime was the making of a false statement *with knowledge of its falsity*. The court said: "The Election Law punishes, not the intentional making of a statement which proves to be false, but the willful making of a false statement, *i. e.*, with knowledge or notice of its falsity, or under circumstances from which an intention to make a false statement might be inferred."

That case supports the contention of the appellants and emphasizes the fact that defendants were entitled to have the jury charged that, if they acted in good faith and with an honest purpose, they were not guilty of a crime. The decision clearly illustrates the law on the subject. A person may not be convicted of a crime for honestly carrying out a transaction which of itself is not criminal. Unless the act alone is both prohibited and made a crime by statute, the act *must be intentionally done with a wrongful purpose, or with a design to injure another, or must be an act committed out of mere wantonnesss or lawlessness.*

To sustain a conviction for the willful misapplication of funds or property, it was essential to establish moral turpitude, and the jury should have been properly instructed upon that subject. (*People* v. *Wiman*, 148 N. Y. 29.)

Other important questions are involved, but a few only require consideration to demonstrate that there should be a reversal of the convictions.

It is properly urged by the defendants that it was error to permit the People to impeach the credibility of the witness Isidore Kresel by admitting in evidence immaterial and opinion evidence given by him before the grand jury and the testimony of other witnesses to prove his statements before the grand jury. The defendants were right in their assertion that the testimony which he gave was nothing more than his opinion and was not competent to impeach

him. That this testimony was damaging, prejudicial and incompetent is clear.

On cross-examination Mr. Kresel was asked whether, when he testified before the grand jury prior to its finding the indictment against the appellants, he had said, among other things: " Now, I come back to it. I have nothing to do, and did not know of the course that this transaction took. I do not understand why it should have been necessary to have this devious way of having these two corporations. I have talked about that. One explanation given to me is that there was a tax problem involved. That if one of these corporations for $4,800,000 of property, which it then sold for $8,000,000 realized the difference as a profit, it would be subject to a tax; and they, up there, were advised by outside tax people, so I understand — I am not vouching for this — that it was wiser to pass it through another corporation. But the very fact that it was passed through that way indicates that there was something suspiciously wrong about it. I would have nothing to do with that sort of a transaction. It is unfortunate that the man who was in my employ was the man who had charge of it."

The witness positively denied making this statement and specifically denied that he uttered the characterizations which it contains. The People were bound by the denials.

Nevertheless, the People produced the stenographer and questioned him as to whether Mr. Kresel had made the foregoing statement before the grand jury, to which line of testimony the appellants objected that the questions related *to collateral matters brought out on cross-examination;* that the portion of the statement which Mr. Kresel denied constituted a characterization or at least included a characterization; that inasmuch as the court on direct examination of Mr. Kresel, over the prosecution's objection, *had excluded his opinion as to the legality of the transaction, the prosecutor should not be permitted to introduce an adverse opinion of the witness before the jury in this indirect way;* that, since the defendants were not represented in the grand jury room, they had no opportunity to cross-examine or to elicit testimony of Mr. Kresel at the time, and that the answer would be grossly prejudicial, unfair, immaterial and irrelevant.

In *People* v. *De Garmo* (179 N. Y. 130, 135) the Court of Appeals said: " When the credibility of the defendant as a witness was assailed by compelling him upon his cross-examination to give testimony which, although competent for purposes of impeachment, was collateral to the main issue, the prosecution, at whose instance the collateral evidence was elicited, was bound thereby and had no right to contradict it. This is an inflexible limitation of the

rule referred to and illustrations thereof are to be found in *Lawrence* v. *Barker* (5 Wend. 301); *Howard* v. *City Fire Ins. Co.* (4 Den. 502); *Stokes* v. *People* [53 N. Y. 164]; *People* v. *Greenwall* [108 id. 296] and *People* v. *Ware* [29 Hun, 473]."

The vice of this testimony was that it was not testimony with reference to facts, but was an unfavorable opinion which was elicited from the witness while before the grand jury, an opinion in nowise binding upon any of the defendants.

In *Holmes* v. *Anderson* (18 Barb. 420) the court said: " In short, the statement of the witness upon which he can be impeached within the rule stated, must not only relate to the issue, but it must be a matter of fact, and not merely a former opinion of the witness in relation to the matter in issue, inconsistent with a different opinion, which seems to be warranted by his testimony, or in other words, which the facts he testifies to tend to establish. The principle of the case is sound, and must control the case under consideration. The principle is that a witness cannot be called to show that another witness has, out of court, given an opinion inconsistent with what the facts now sworn to by him will warrant." (See, also, *Matter of Eno*, 196 App. Div. 131, 159; *Schell* v. *Plumb*, 55 N. Y. 592, 599; *Potter* v. *Browne*, 197 id. 288, 293; *Bright* v. *Wheelock*, 323 Mo. 840; 20 S. W. [2d] 684.)

In *People* v. *Stackhouse* (49 Mich. 76) the court said: " The opinion or suspicions of the witness out of court, although inconsistent with the conclusion which the facts she testifies to on the trial would warrant, cannot be made the basis of an impeachment. This is so firmly settled by the authorities that the question cannot be considered an open one."

The evidence was also clearly within the rule stated in Wigmore on Evidence (Vol. 4 [2d ed.], p. 3, § 1864): " * * * If certain evidential material, having a legitimate probative value, tends nevertheless to produce also, over and above its legitimate effect, an unfair prejudice to the opponent, or by virtue of the personality of the witness tends to receive an excessive weight in the minds of the tribunal, there is good ground for excluding such evidence, unless it is indispensable for its legitimate purpose."

The prosecution in any event was bound by Mr. Kresel's denial. (See *United States* v. *Sager*, 49 F. [2d] 725; *People* v. *De Garmo*, *supra*; *People* v. *Grout*, 174 App. Div. 608; *Stokes* v. *People*, 53 N. Y. 164; *Carpenter* v. *Ward*, 30 id. 243, 249.)

Defendants were not allowed to show that before the transaction was carried through they were advised it was in all respects lawful. The court specifically charged that the advice of counsel was not material. If the advice of counsel was immaterial it is difficult to

see how it became permissible to prove the unfavorable opinion given by Mr. Kresel before the grand jury. It was not admissible as an attempt to impeach him or to show that he believed the transaction improper. By ruling that the advice of counsel was immaterial and incompetent, the court in effect ruled that it was collateral in its nature and immaterial.

It was error, therefore, to admit in evidence this so-called impeaching testimony.

It must be borne in mind that this criminal proceeding grows out of a commercial transaction, carried through by directors of a safe deposit company, a transaction which these directors insist was in all respects perfectly honest and legal and which they insist was either approved or made necessary by orders of the State Banking Department.

The appellants point out that at the time of the transaction in question, the Bank of United States was owed a certain sum of money and when the transaction was completed, the same amount was owed the bank.

The Municipal Safe Deposit Company was entirely owned by the Bank of United States, and if the Municipal Safe Deposit Company should in any event lose anything it would be a loss to the Bank of United States. In reality, this whole transaction was simply a matter of a transfer of part of the assets and liabilities of one subsidiary corporation to another.

The appellants, therefore, were entitled to have squarely presented to the jury the question whether they had acted honestly, in good faith and in an endeavor to carry out a business transaction which they believed was in all respects proper, or whether they willfully misapplied money or property by acting dishonestly and with a wicked design in carrying out a transaction forbidden by law.

Throughout the trial the prosecution asserted and took upon itself the burden of proving bad intent, subterfuge and concealment; and the defense sought to prove good faith, honesty of purpose and sincere reliance on the advice of counsel as well as an official practice and approval. In addition, the defense claimed that as a matter of law the prosecution was bound to prove wanton conduct and fraud. The trial court not only overruled these claims of the defense as to the law, but by the charge, in effect, struck out the entire subject of good faith, and at the same time left as relevant for conviction the question of bad faith.

In view of the law applicable to the *willful misapplication of funds* of a corporation as outlined in the numerous cases dealing with the subject, the defendants were entitled to a charge on the

question of intent, good faith and honest motives and as to whether they acted upon advice of counsel. Those elements were material.

The prosecution was allowed to prove many matters for the alleged purpose of showing the entire transaction, although these occurred months before the transaction. Such evidence appears to have been presented for no other purpose than to show evil intent and dishonest motives. If the prosecution had a right to show intent, bad motives and evil design under any label or name, the defendants had a right to show good faith, the attitude of the Banking Department, the advice of counsel and honest motives. The defendants were entitled to a charge in this case which clearly defined the issues and presented the questions of good faith, honest motives and the absence of wrongful intent.

The court attempted to justify the enormous amount of evidence of occurrences long prior and subsequent to the transaction, admitting the evidence as " * * * an endeavor to prove to you that what the defendants are alleged to have done on January 13th, 1930, in the matter of the purchase of 25 shares of Premier stock, was done intentionally and by design, instead of being the result of inadvertence."

Later, however, the court charged the jury as follows: " But there is no intent mentioned in this section under which these defendants are being prosecuted."

Although it was charged that intent was not an element in the case, the trial covered several weeks and thousands of pages of testimony were taken in trying to prove bad intent and wrongful motives.

In *People* v. *Clark* (242 N. Y. 313), where it was claimed that it was not necessary to prove intent, because intent was no part of the crime, the court very properly said: " The case presents squarely the question whether under the statute the stigma of the felon may be placed upon one who has been guilty only of error of judgment or mistake of law."

The court then further said: " Ordinarily the Legislature may not be presumed to have passed a penal statute making an act a felony unless it believed that the prohibited act was vicious. Penal statutes should be construed accordingly to give effect to the legislative intent. The crime of receiving money ' not authorized by law ' is not committed unless the money is received with wrongful intent. That intent is shown when it appears that the public officer has received something which he knows that the law does not permit him to accept. The law is too often complicated and doubtful to permit us to hold that knowledge of the law must in such case be conclusively presumed so that the jury may convict

where in fact there has been no corrupt or criminal intent and no intention to injure others or to do the prohibited act and no understanding that the defendant was receiving more than he legally might."

In *Williamson* v. *United States* (207 U. S. 425) the defendants were charged with conspiring to violate the Timber and Stone Act of June 3, 1878. In that case the United States Supreme Court approved a charge of the trial court which concisely set forth the law on the subject of advice of counsel. The charge was as follows: " Having now placed before you the Timber and Stone Law and what it denounces, and what it permits, if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do in the matter of loaning money to applicants under it, and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves willful and unlawful intent; even if such advice were an inaccurate construction of the law."

The charge to the jury that a moneyed corporation had no right to purchase stock of another corporation for speculative purposes, and the refusals to charge as requested, clearly constituted serious error.

During the trial there was evidently considerable doubt as to the actual charge against the appellants. This doubt seems to have been shared by the jury, because after a trial lasting more than ten weeks, and after hearing an extended charge by the court, the jury returned to the court room and asked the following question: " May we have read to us the Court's interpretation of the law concerning safe deposit companies; also such parts of the Court's charge to the jury as bearing upon the interpretation of willful misapplication? "

In response to this request, at a time when the jury was in doubt with reference to the instructions previously given, the court reread portions of the charge and then made the following statement, one of the most important made by the court at any time: " Being a moneyed corporation it had no right to purchase stock of another corporation for speculative purposes.

" Under certain circumstances it might purchase stock. It could purchase stock for legitimate corporate purposes, incidental to its proper functioning, for instance, if it desired to purchase real estate in connection with its business, and the real estate was held in the name of a corporation, in order to acquire title to the property that it wanted to occupy and use in connection with its

corporate purposes it might purchase the stock of the company that owned the real estate. Also, it might, for instance, purchase stock to replace stocks which had been deposited with it, and which had been lost. But as a general proposition, a safe deposit company has no right to go into the market and purchase stock. * * *

" In other words, as I told you not only here but two or three more times, in the course of my charge I referred to the definition of ' wilfully ' and ' misapply.' I stated to you ' wilfully ' means intentionally and by design. That means that the party doing the act does it with full knowledge of all the facts and circumstances; that he does not act through a mistaken idea as to what the facts are; that he knows the facts at the time he acts, and knowing the facts, under my interpretation of the law, he does it intentionally. And ' misapply ' merely means to apply to an improper purpose."

The court by its charge to the jury and its refusal to charge as requested by defendants adopted the erroneous theory of the indictment that a safe deposit company was prohibited from purchasing stock for corporate purposes. The court, although requested to do so, refused to charge as follows: " The Municipal Safe Deposit Company was not prohibited by statute from purchasing for its corporate purposes stock of the Premier Development Company.

"A safe deposit company organized under the Banking Law of the State of New York is not prohibited by law from purchasing, for its corporate purposes, stocks of other corporations."

The court refused the following requests to charge on this same subject:

" I instruct you, as a matter of law, that at the time of the transaction charged in the indictment there was *no prohibition* upon, or any lack of power in, the Municipal Safe Deposit Company to acquire stock in other corporations and that the mere purchase of stock by a safe deposit company in and of itself was not illegal, and, therefore, to cause the funds of the Municipal Safe Deposit Company to be used to purchase stock in another corporation would not, in and of itself, constitute a misapplication of its funds under section 305 of the Penal Law.

" There can be no conviction in this case on the *sole* ground that the defendants caused the Municipal Safe Deposit Company to use its money for the purchase of the Premier stock, because at the time of the transaction in question there was no specific prohibition in law upon a safe deposit company purchasing stock in other corporations, and in the absence of such a specific prohibition, the mere causing of the Municipal Safe Deposit Company to expend these moneys to acquire stock in excess of the powers given to it

by law, would not constitute a willful misapplication of its funds under section 305 of the Penal Law."

There is no inhibition against a safe deposit company purchasing stock. If such an inhibition existed, unless it was made a crime it would be an *ultra vires* act only. (*Dyer* v. *Broadway Central Bank*, 252 N. Y. 430, 435.)

In the presentation of this case to the jury the great difficulty appears to have been that when particular evidence served the purpose of the prosecution it was argued that it was offered to prove the whole transaction, though in effect it was an attempt to show that the acts of the defendants were in bad faith and for an evil purpose. When the defendants offered testimony to meet this evidence, it was held not competent,

It is also difficult to understand on what ground the court admitted in evidence acts which occurred after the transaction in question.

It is also urged by the people that this evidence was admitted to show the entire transaction. The real purpose was evidently to show evil intent. It was not admissible for any such purpose.

We are finally told that many of the errors may be overlooked, in view of the provisions of section 542 of the Code of Criminal Procedure. The errors committed were most serious and may not be brushed aside in any such manner. That the district attorney considered them to be very material is shown by his attempts to justify the rulings of the court, especially on the admission and rejection of evidence.

It is unnecessary to advert to the many other points urged by the appellants. Those considered are sufficient to require a reversal of the convictions, as well as a dismissal of the indictment.

Judgment and order affirmed.