## PEOPLE v ADAMS

### Opinion of the Court

1. KIDNAPPING—STATUTES—CONSTRUCTION.
    Since the kidnapping statute is not a model of clarity it is the constitutional duty of the Michigan Supreme Court to give a reasonable construction to it (MCLA 750.349).

2. KIDNAPPING—ASPORTATION—STATUTES—CONSTITUTIONAL LAW.
    The sweep of a part of the kidnapping statute, reading "[a]ny person who wilfully, maliciously and without lawful authority shall forcibly * * * confine or imprison any other person within this state against his will", is so broad that it requires interpolation of the historical concept of asportation to render it constitutional, and it is the duty of the Michigan Supreme Court to do so (MCLA 750.349).

3. KIDNAPPING—COMMON LAW—MISDEMEANOR—ABDUCTION—STATUTES—ASPORTATION.
    At common law, kidnapping was a misdemeanor with well defined elements; first, the forcible abduction of a person from his own country, and second, sending him to another country; statutory law, in modifying common-law kidnapping, has abolished the requirement that a national or regional boundary be breached; however, with the abolition of the breached boundary requirement, a lack of precision was created in the law as to the degree of asportation required to transform a lesser crime into kidnapping (MCLA 750.349).

4. KIDNAPPING—CONFINEMENT—ASPORTATION.
    To constitute kidnapping it is sufficient that the confinement and asportation are not merely incidental to a lesser underlying crime (MCLA 750.349).

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 5, 6, 8–10] 1 Am Jur 2d, Abduction and Kidnapping §§ 1, 11.
[3, 7] 1 Am Jur 2d, Abduction and Kidnapping § 3.
[4] 1 Am Jur 2d, Abduction and Kidnapping § 12.
[11, 12, 14–19] 1 Am Jur 2d, Abduction and Kidnapping § 30.
[13] 1 Am Jur 2d, Abduction and Kidnapping §§ 29, 31.

5. KIDNAPPING—STATUTES—ASPORTATION.

Under the kidnapping statute a movement of the victim does not constitute an asportation unless it has significance independent of the assault; the movement element must not be merely incidental to the commission of a lesser underlying crime, it must be incidental to the commission of the kidnapping (MCLA 750.349).

6. KIDNAPPING—STATUTES—ASPORTATION.

Since the language of the first part of the kidnapping statute by itself is so general as to be susceptible of defining minor crimes as well as kidnapping, where appropriate, asportation must be interpolated to achieve the Legislature's intention to define the major crime of kidnapping; the movement element is not sufficient if it is "merely incidental" to the commission of another underlying lesser crime (MCLA 750.349).

7. KIDNAPPING—STATUTES—ASPORTATION—MURDER—EXTORTION— HOSTAGES.

Movement incidental to an underlying crime of murder, extortion or taking a hostage is generally sufficient to establish a valid statutory kidnapping (MCLA 750.349).

8. KIDNAPPING—ASPORTATION—DANGER.

A factor in considering whether the movement of a victim adequately constitutes the necessary legal asportation for kidnapping is whether the movement adds either a greater danger or threat thereof, but there could be asportation without this element of additional danger so long as the movement was incidental to a kidnapping and not a lesser crime (MCLA 750.349).

9. KIDNAPPING—STATUTES—SECRET CONFINEMENT—ASPORTATION.

Secret confinement or some other non-movement factor may supply a necessary alternative to asportation to complete statutory kidnapping (MCLA 750.349).

10. KIDNAPPING—STATUTES—ASPORTATION—JURY QUESTION—QUESTION OF FACT.

Whether or not a particular movement constitutes statutory asportation or whether there is an appropriate alternative element must be determined from all the circumstances under the standards set out by the Michigan Supreme Court and is a question of fact for the jury in a kidnapping case (MCLA 750.349).

11. CRIMINAL LAW—JURY—COURTS—FACTS.

Jurors are the sole judges of the facts and neither a trial court nor the Michigan Supreme Court can interfere with their exercise of that right; it is not the province of the Court to usurp the proper functions of the jury in determining issues of fact and it is not for the Court to say that the jury would have so found, if the issue had been submitted to it.

12. KIDNAPPING—EVIDENCE—INSTRUCTIONS—ASPORTATION—HOSTAGES.

The function of the jury would be to weigh the evidence presented to it in the light of the court's charge in order to determine whether the real crime involved was a minor one and the movement incidental thereto, or whether the real crime did indeed involve the taking of a hostage in order to extort something of value and that the movement was an asportation incidental to committing a kidnapping where defendant, an inmate of a prison, seized a prison officer and took him to the prison hospital 1500 feet away, repeatedly demanded to see various prison officials and a newspaper reporter to air grievances, and released the officer about 5-1/2 hours later (MCLA 750.349).

13. INDICTMENT AND INFORMATION—KIDNAPPING—NATURE OF ACCUSATION—CONSTITUTIONAL LAW.

Information which used the exact language of the kidnapping statute but did not specifically charge asportation was sufficient but not exactly a standard for emulation; defendant knew of the nature and character of the crime he was charged with and, since his constitutional rights to be informed of the nature of the accusation were not violated, any other minor defects in the information were waived by the pleadings (Const 1963, art 1 § 20; MCLA 750.349).

14. CRIMINAL LAW—INSTRUCTIONS.

The purpose of the court's charge to the jury is to explain the issues and the legal principles applicable to the facts in issue.

15. KIDNAPPING—ASPORTATION—QUESTION OF FACT.

Asportation is a question of fact and it is an essential element of the crime of kidnapping (MCLA 750.349).

16. CRIMINAL LAW—INSTRUCTIONS.

Trial court has a duty to accurately charge a jury as to the elements of an offense and what must be proved in order to establish such elements.

17. Kɪᴅɴᴀᴘᴘɪɴɢ—Iɴsᴛʀᴜᴄᴛɪᴏɴs—Asᴘᴏʀᴛᴀᴛɪᴏɴ.

Charge to jury in a kidnapping case was inadequate because the charge should have included the question of whether the necessary asportation was present (MCLA 750.349).

Dɪssᴇɴᴛɪɴɢ Oᴘɪɴɪᴏɴ

T. E. Bʀᴇɴɴᴀɴ, J.

18. Kɪᴅɴᴀᴘᴘɪɴɢ—Iɴsᴛʀᴜᴄᴛɪᴏɴs—Rᴇǫᴜᴇsᴛᴇᴅ Iɴsᴛʀᴜᴄᴛɪᴏɴs—Oʙᴊᴇᴄ-ᴛɪᴏɴs ᴛᴏ Iɴsᴛʀᴜᴄᴛɪᴏɴs—Aᴘᴘᴇᴀʟ ᴀɴᴅ Eʀʀᴏʀ.

*Sufficiency of the trial court's instruction in a kidnapping case is not before the Michigan Supreme Court where a claimed omission from the trial court's instruction was never brought to the attention of the trial judge either by requested instruction or objection to the charge; never briefed nor argued in the Michigan Court of Appeals by the litigants and never argued nor briefed in the Michigan Supreme Court.*

19. Kɪᴅɴᴀᴘᴘɪɴɢ—Asᴘᴏʀᴛᴀᴛɪᴏɴ—Aᴘᴘᴇᴀʟ ᴀɴᴅ Eʀʀᴏʀ—Issᴜᴇs ᴏɴ Aᴘ-ᴘᴇᴀʟ.

*Conviction of kidnapping should be affirmed because the issue of asportation was not before the Michigan Court of Appeals where the disputed issue was whether defendant was one of those who kidnapped the victim and the Court of Appeals, on its own motion, requested briefing of issues regarding asportation but there was no discussion of asportation at the trial.*

Appeal from Court of Appeals, Division 2, J. H. Gillis, P. J., and Bronson and Levin, JJ., reversing Jackson, Charles J. Falahee, J. Submitted March 9, 1972. (No. 11 March Term 1972, Docket No. 53,562.) Decided March 27, 1973. Rehearing denied June 18, 1973.

34 Mich App 546 affirmed in part, reversed in part.

Otis L. Adams was convicted of kidnapping. Defendant appealed to the Court of Appeals. Reversed. The people appeal. Affirmed in part, reversed in part and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Bruce A. Barton,*

Prosecuting Attorney, and *Paula O. Hosick,* Chief Appellate Attorney, for the people.

*James S. Treciak,* defendant on appeal.

WILLIAMS, J. There are three controlling issues. First, is that part of the Michigan kidnapping statute, MCLA 750.349; MSA 28.581, reading "[a]ny person who wilfully, maliciously and without lawful authority shall forcibly * * * confine or imprison any other person within this state against his will * * * shall be guilty of a felony," constitutionally viable without interpolating asportation or some similar element? Second, could the jury lawfully find asportation under the facts of this case? Third, was the jury lawfully charged?

## I. FACTS

It is necessary to detail the facts quite thoroughly in order that the elements of the kidnapping statute can be better examined and applied to this case. We adopt the statement of facts in the Court of Appeals' majority opinion which found them inadequate to sustain asportation:

"On the morning of October 18, 1965, Adams consumed substantial quantities of alcohol and barbiturates in the company of several other inmates of Jackson Prison. Their conversation turned to the grievances —real or imagined—which they felt against the prison administration.

"Shortly after 11 a.m., Adams and inmate Edward Whitehead went to the main dining hall of the prison where lunch was being served. Adams cut into the serving line ahead of other inmates and was told by a guard to go to the end of the line. Adams directed some verbal abuse at the guard, then proceeded with Whitehead to the prison's 4-block, a cell block in the northwest portion of the prison. Adams' conduct aroused the

attention of two unarmed prison guards who followed him to 4-block.

"Because this was the lunch hour, several hundred prisoners were milling about 4-block. The presence of Adams and Whitehead, plus a third inmate, Alvin Shaw, all of whom were highly agitated, as well as the two guards and the hundreds of milling prisoners, led to a disturbance of uncertain proportions.

"At this time Inspector Joseph Dembosky, the highest ranking uniformed prison officer, was notified of the disturbance in 4-block. He immediately proceeded to the area and thrust himself into the center of the milling crowd.

"Before Inspector Dembosky could take any action, he was seized from behind by inmate Whitehead, who held a knife to his throat. Adams also produced a knife which he used to wave back the prisoners pressing in on Inspector Dembosky and Whitehead. At the trial Inspector Dembosky testified that at this point he said, 'Can't we talk about this?' Another witness testified that Dembosky said, 'Can't we go somewhere and talk about this?' Adams, Whitehead, and Shaw, all of whom had knives, then accompanied Dembosky at knifepoint out of 4-block into the prison yard.

"There were approximately one thousand inmates in the yard as Dembosky, Whitehead, Shaw, and Adams left 4-block. Inspector Dembosky testified that he felt that there was danger of a riot if the party remained in the yard. He suggested that they go to the prison gymnasium to talk things over. Instead, he was forced to accompany Whitehead, Shaw, and Adams to the prison hospital, which was roughly 1500 feet from the entrance to 4-block. During their journey to the hospital, the armed inmates repeatedly shouted warnings to the heavily-armed tower guards that Inspector Dembosky would be killed if they were fired upon.

"Shortly before reaching the hospital building, the group was joined by another inmate, Milton Thomas, who was also armed. Together, immediately after entering the hospital, they seized two guards, a prison doctor, and an inmate elevator operator named Hubbard. Shaw, Whitehead, Thomas, and Adams, together with

Inspector Dembosky and the other victims, then proceeded to the doctor's lounge on the fifth floor of the hospital.

"Adams and his cohorts erected barricades around the lounge. Over an intercom, they repeatedly demanded to see various prison officials, as well as the warden, to air their grievances. They also demanded to see a newspaper reporter. There were repeated warnings that Inspector Dembosky would be killed if they were fired upon.

"During the hours that followed, the armed inmates displayed contradictory behavior toward their captives. The physician was released when Adams ascertained that he had a heart condition. Thomas told the warden to notify the pregnant wife of one of the captive guards that he would not be harmed. Contrastingly, inmate Hubbard was severely beaten by Adams, then released as an example of Adams' serious intentions.

"A number of prison officials visited the fifth floor landing to discuss grievances. A newspaper reporter summoned to the scene was occupied for almost three hours in recording these grievances. Adams repeatedly expressed his fear of being shot by guards when he left the fifth floor.

"After about 5-1/2 hours, Shaw, Whitehead, Thomas, and Adams were persuaded to abandon their barricaded position. Upon being given assurances that they would not be shot, they released their captives unharmed. They then proceeded to the deputy warden's office, where they surrendered their weapons." 34 Mich App 546, 552–554.

The portion of the statute we are called on to construe is that set forth in the information. Defendant Adams was tried on charges of: "wilfully, maliciously, and without lawful authority forcibly confining and imprisoning another person * * * within this state and against his will."

At trial the jury returned a verdict of guilty and in a split decision the Court of Appeals reversed.

Judge LEVIN for a divided Court held the statute unconstitutionally overbroad unless limitations were interpolated to confine its operative effect. He added this limitation by construing the statute to require an asportation so as to differentiate the offense from false imprisonment. This asportation, he held, must have a significance independent of the underlying crime (i.e., assault) and also must remove the victim from the environment in which he is found and expose him to an increased risk of harm. He held that as a matter of law the instant facts did not constitute such asportation and hence there was no kidnapping. Judge GILLIS dissented saying the facts constituted a typical kidnapping.

## II. THE STATUTE AND ITS CONSTRUCTION

The text of the statute involved, MCLA 750.349; MSA 28.581, with the part charged in the information in italics reads as follows:

"Any person *who wilfully, maliciously and without lawful authority shall forcibly* or secretly *confine or imprison any other person within this state against his will,* or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." (Emphasis added.)

Since this statute is not a model of clarity it is our constitutional duty to give a reasonable construction to it. The cases under the statute provide little guidance, however.[1]

We agree with Judge LEVIN's thoughtful and careful analysis that the sweep of this part of the statute is so broad that it requires the interpolation of the historical concept of asportation to render it constitutional, and it is our duty to do so. See *Michigan Towing Association, Inc, v Detroit,* 370 Mich 440, 456 (1963); *State Bar of Michigan v Lansing,* 361 Mich 185, 195 (1960). Failure to do so would result in denial of due process, *Giaccio v Pennsylvania,* 382 US 399; 86 S Ct 518; 15 L Ed 2d 447 (1965).

Where a kidnapping statute does not in terms require asportation or its equivalent, such a requirement has not infrequently been judicially read into and made a part of the definition of the crime.[2]

## III. THE ASPORTATION REQUIREMENT

At common law, kidnapping was a misdemeanor with well defined elements; first, the forcible abduction of a person from his own country, and second, sending him to another country. This was

[1] The cases dealing with prosecutions under this statute involve little or no construction of the statute. *People v Congdon,* 77 Mich 351 (1889); *People v Minchella,* 268 Mich 123; 93 ALR 805, *cert den,* 293 US 619; 55 S Ct 217; *reh den* 55 S Ct 345; 79 L Ed 707 (1934); *People v Burk,* 7 Mich App 692 (1967); *People v Morris,* 10 Mich App 526 (1968); *People v Shaw,* 11 Mich App 255 (1968); *People v Emery,* 13 Mich App 616 (1968); *People v Curtis,* 17 Mich App 720 (1969); *People v Kildow,* 19 Mich App 194 (1969); *People v Markham,* 19 Mich App 616 (1969); *People v Glenn,* 20 Mich App 537 (1969); *People v Haurgabook,* 23 Mich App 356 (1970); *People v Dickerson,* 23 Mich App 621 (1970); *People v Cook,* 24 Mich App 401 (1970); *People v Ruppuhn,* 25 Mich App 62 (1970); *People v Leon Morgan,* 27 Mich App 388 (1970); *People v Walker,* 28 Mich App 650 (1970); *People v Washington,* 30 Mich App 435 (1971); *People v Shuck,* 31 Mich App 70 (1971); *People v Rolston,* 31 Mich App 200 (1971); *People v Otis Adams,* 34 Mich App 546 (1971) (the instant case); *People v Warren,* 34 Mich App 622 (1971); *People v Nodine,* 36 Mich App 80 (1971).

[2] Perkins, Criminal Law (2d ed), p 177.

considered more than false imprisonment, since kidnapping included all the elements of false imprisonment with the additional element of asportation of the victim outside his own country and beyond the protection of its laws.[3]

Statutory law, in modifying common-law kidnapping, has abolished the requirement that a national or regional boundary be breached.[4] However, with the abolition of the breached boundary requirement, a lack of precision was created in the law as to the degree of asportation required to transform a lesser crime into kidnapping.[5]

Torn between the common-law rule that a most significant asportation was required, and the obvious legislative intention to broaden the scope of the offense, the courts, virtually without exception, began by endorsing the idea that any movement, however slight, was sufficient to constitute the asportation element of kidnapping.[6]

---

[3] Note, *A Rationale of the Law of Kidnapping,* 53 Colum L Rev 540 (1953).

[4] *Id.* See also Model Penal Code Tentative Draft No. 11, p 11 *et seq.*

[5] California specifically includes the concept of movement in its kidnapping statute and the California courts have been concerned to determine what kind of movement is necessary to constitute asportation. The California statute reads:

"Every person who forcibly steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county, or forcibly takes or arrests any person with a design to take him out of this state * * * ." California West Annotated Statutes, § 207.

Both New York and Michigan have statutes which do not specifically use words which connote movement. The penal laws of New York, § 135.20, entitled *Kidnapping in the Second Degree* states as follows:

"A person is guilty of kidnapping in the second degree when he abducts another person."

The definition of "abduct" is defined in § 135.00:

" 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force."

[6] See for example *People v Florio,* 301 NY 46; 92 NE2d 881 (1950); *State v Lowry,* 263 NC 536; 139 SE2d 870 (1965); *State v Kress,* 105 NJ Super 514; 253 A2d 481 (1969).

Representative of this formulation were the opinions of the California Supreme Court in *People v Chessman,* 38 Cal 2d 166, 192; 238 P2d 1001, 1017 (1951) and *People v Wein,* 50 Cal 2d 383, 399–400; 326 P2d 457, 466 (1958). In *Chessman,* the defendant forced his victim to move 22 feet to his automobile, where he sexually assaulted her. The Court held that, "It is. the fact, not the distance, of forcible removal which constitutes kidnapping in this state." In *Wein,* the Court applied the *Chessman* standard to uphold the kidnapping confession of a defendant who forced his victims to move from room to room in their own homes during a series of robberies and rapes. The Court stated:

"If the section, as interpreted by this court is regarded as too harsh, the remedy is for the Legislature to redefine kidnapping, and not for this court to engraft some uncertain distance limitation. into the plain language of the section." *Id.*

However, after a time representative courts perceived that unrestrained recognition of any movement at all as adequate to support kidnapping was letting the pendulum swing to absurd and unconscionable results. The New York Court of Appeals in *People v Miles,* 23 NY2d 527; 297 NYS2d 913, 922; 245 NE2d 688, 695 (1969) in referring to two cases that checked this wide swing said:

"In short, the *Levy-Lombardi* rule was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal."

Speaking to this point Judge LEVIN for the Court of Appeals majority well said of that part of our kidnapping statute which concerns us here:

"It is obvious that virtually any assault, any battery, any rape, or any robbery involves some 'intentional

confinement' of the person of the victim. To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery, into a capital offense. A literal reading of the kidnapping statute would permit a prosecutor to aggravate the charges against any assailant, robber, or rapist by charging the literal violation of the kidnapping statute which must inevitably accompany each of those offenses." 34 Mich App 546, 560 (1971).

In 1969, the California Supreme Court overruled its prior constructions in the *Chessman-Wein* line of cases. *People v Daniels,* 71 Cal 2d 1119, 1139; 459 P2d 225, 238; 80 Cal Rptr 897, 910 (1969) clearly repudiates the doctrine that any movement at all of the victim is sufficient to constitute the asportation element of kidnapping. There the victims had been forced to move about in their apartments during the commission of crimes of robbery and rape. The Court declared:

"[W]e hold that the intent of the Legislature * * * was to exclude from [the statute's] reach not only 'standstill' robberies * * * but also those in which the *movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." Id.* (Emphasis added.)

And in *People v Timmons,* 4 Cal 3d 411, 415; 482 P2d 648, 651; 93 Cal Rptr 736, 739 (1971), the Court elaborated on the *Daniels* standard by finding that forcing a robbery victim to drive five city blocks in order to facilitate the robbery, did not constitute kidnapping. The Court stated:

"The true test is not mere mileage but whether the movements of the victims 'substantially increase the risk of harm' beyond that inherent in the crime of robbery itself." *Id.*

To summarize the two-fold California test, the type of asportation necessary to buttress a kidnapping conviction is that:

1. The movement element must not be "merely incidental" to the commission of another underlying lesser crime.

2. The movement must "substantially increase the risk of harm" beyond that inherent in the underlying lesser crime.

New York, which in *People v Florio,* 301 NY 46; 92 NE2d 881 (1950) had adopted the any movement rule, had previous to the above cited California cases written a standard similar to the movement "merely incidental" to a lesser crime rule in California in three cases: *People v Levy,* 15 NY2d 159; 256 NYS2d 793; 204 NE2d 842 (1965); *People v Lombardi,* 20 NY2d 266; 282 NYS2d 519; 229 NE2d 206 (1967); *People v Miles,* 23 NY2d 527; 297 NYS2d 913; 245 NE2d 688 (1969). In the last case, the Court described the limitation of the rule:

"The more complicated nature of the asportation, with changes in purpose and direction, first to a place in New Jersey, and then to New York, for purposes connected with but not directly instrumental to the attempt to kill Brooks, removes this case from the exception of the *Levy-Lombardi* rule.

"In the *Levy* and *Lombardi* cases, * * * , the restraint and asportation were parts of the crimes ultimately committed. * * * It is this kind of factual merger with the ultimate crime of the preliminary, preparatory, or concurrent action that the rule is designed to recognize, and thus prevent unnatural elevation of the 'true crime' to be charged.

"Moreover, the rule has no purpose of ignoring as independent crimes alternative or optional means used in committing another crime, which, * * * , constitute and should constitute a separately cognizable offense. *Nor was the Levy-Lombardi rule intended to exclude*

*from the 'traditional' or 'conventional' kidnapping ab-
ductions designed to effect extortions or accomplish
murder."* (Emphasis added.) *Id,* 23 NY2d 527, 539–540;
297 NYS2d 913, 921–922; 245 NE2d 688, 694.

New York established three rules:

1. The movement element must not be "merely
   incidental" to the commission of another under-
   lying lesser crime.
2. The movement of a "more complicated nature"
   may sustain a kidnapping charge.
3. Statutory kidnapping continues to include "tra-
   ditional" or "conventional" kidnapping abduc-
   tions designed to effect extortions or accomplish
   murder.

The first or "merely incidental" rule is common
to New York and California, namely if the move-
ment is merely incidental to the commission of
another underlying lesser crime, it will not sustain
kidnapping. We feel that this is the critical and
significant criterion and regard the other two
criteria illustrative and not controlling.

## IV. A MICHIGAN ASPORTATION STANDARD

In formulating its asportation standard, the
Michigan Court of Appeals held that, as in the
California cases of *Daniels* and *Timmons,* to consti-
tute kidnapping the asportation must "substan-
tially" increase "the risk that the victim may
suffer significant physical injuries over and above
those to which a victim of the underlying crime is
normally exposed" and also devised its own
"change of environment" rule. 34 Mich App 567.
We hold that these are not determinative criteria
to be applied in deciding the sufficiency of the
asportation. We hold that it is sufficient that the

confinement and asportation are not merely incidental to the lesser underlying crime.

Judge LEVIN for the Court of Appeals in an otherwise exemplary opinion adopted a two sentence standard for movement to constitute asportation sufficient to sustain kidnapping in the instant case. We agree with the first sentence although we stated it differently above. We do not agree with the second sentence nor believe it supported by the cases or reason. Part of the problem is a definition of "environment"—in one sense you can change the environment of the smallest room by intruding a criminal with a weapon, although in another sense it is still the same room. The two sentence standard established by Judge LEVIN is:

"We have concluded that under the kidnapping statute a movement of the victim does not constitute an asportation unless it has significance independent of the assault. And, unless the victim is removed from the environment where he is found, the consequences of the movement itself to the victim are not independently significant from the assault—the movement does not manifest the commission of a separate crime—and punishment for injury to the victim must be founded upon crimes other than kidnapping." *Id*, 34 Mich App 568.

As above indicated we hold the movement element must not be merely incidental to the commission of a lesser underlying crime, *i.e.*, it must be incidental to the commission of the kidnapping.

What is a kidnapping? This concept is not always too well defined but two New York cases at least specify some things that are kidnapping, as does the second half of the Michigan statute. We have already quoted the following from *People v Miles, supra:*

"Nor was the *Levy-Lombardi* rule intended to exclude

from the 'traditional' or 'conventional' kidnapping abductions designed to effect extortions or accomplish murder."

The second pertinent quotation is from *People v Levy, supra,* and reads as follows:

"*People v Black,* 18 AD 2d 719 [; 236 NYS2d 240 (1962)], is an illustration of separately established crimes of robbery and kidnapping: One of the victims of the robbery was taken along *as a hostage* to another State and held for considerable time, long after the robbery had been completed." *Id.* (Emphasis added.)

In other words, whatever else kidnapping may or may not include, these two New York cases focus on extortions, murder, and taking a hostage. Murder is not pertinent to this case but extortion and taking a hostage may be.

At this point the Michigan kidnapping statute in full is instructive although it is recognized that the latter half relative to extortion and holding "to service against his will" were not specifically pled. The statutory language is:

"Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly, seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." MCLA 750.349; MSA 28.581.

In interpreting the first part of the Michigan

kidnapping statute to avoid constitutional overbreadth the following factors are to be considered:

1. Since the language of the first part of the kidnapping statute by itself is so general as to be susceptible of defining minor crimes as well as kidnapping, where appropriate, asportation must be interpolated to achieve the Legislature's intention to define the major crime of kidnapping.

2. The movement element is not sufficient if it is "merely incidental" to the commission of another underlying lesser crime.

3. If the underlying crime involves murder, extortion or taking a hostage, movement incidental thereto is generally sufficient to establish a valid statutory kidnapping.

4. If the movement adds either a greater danger or threat thereof, that is a factor in considering whether the movement adequately constitutes the necessary legal asportation, but there could be asportation without this element of additional danger so long as the movement was incidental to a kidnapping and not a lesser crime.

5. Where appropriate, secret confinement or some other non-movement factor may supply a necessary alternative to asportation to complete statutory kidnapping.

6. Whether or not a particular movement constitutes statutory asportation or whether there is an appropriate alternative element must be determined from all the circumstances under the standards set out above and is a question of fact for the jury.

"Jurors are the sole judges of the facts and neither the trial court nor this court can interfere with their exercise of that right." *People v Miller,*

301 Mich 93, 100 (1942). And in *People v Putnam,* 323 Mich 374, 379 (1948), Justice BOYLES stated, "It is not the province of the Court to usurp the proper functions of the jury in determining issues of fact. It is not for the Court to say that the jury would have so found, if the issue had been submitted to it."

## V. THE STANDARDS APPLIED TO THE FACTS OF THIS CASE

As indicated above, the factual circumstances of the case present a jury question under proper instructions based on the standards set forth above.

Judge LEVIN was in his opinion, as we now are, faced with the dilemma of analyzing how the known facts in this case fit into the legal standards just established for the benefit of judicial review without presuming upon the jury's function. Judge LEVIN seized one horn of the dilemma and concluded:

"Under the circumstances we are satisfied that the evidence does not support a finding that the movement had significance adverse to Inspector Dembosky independent of the continuing assault." 34 Mich App 571.

Unfortunately since we disagree with this mixed law and fact conclusion, we are compelled to make analysis of the facts beyond what we would have wished giving due respect to the jury's function.

Judge LEVIN assumed, or found, that the lesser underlying crime was a "continuing assault" and that the movement was not "independent" of it. We can visualize at least three different possible underlying crimes to which the movement might relate rather than just this one. These three possi-

bilities are: assault, common-law confinement or false imprisonment, and kidnapping.

As to assault Judge Levin has written to that. If the jury had been properly instructed, it might or might not have chosen to regard this as the real crime involved. Depending upon the jury's view of what the assault really was, the asportation might or might not be incidental to it rather than to a kidnapping, if any.

As to common-law unlawful confinement or false imprisonment, the jury might well find that the real crime had these earmarks more than an assault, for it might be difficult for the jury to find that the assault element constituted the real crime as there was no apparent motive for the assault in the sense of acting to harm Inspector Dembosky, as, if that were the motive, no direct physical harm was actually inflicted although there was ample opportunity to do so. If confinement or false imprisonment appeared to be the real underlying crime, then the question for the jury would be, was the movement such as to constitute the crime of kidnapping. Since kidnapping and unlawful confinement and false imprisonment have essentially common elements the character of the movement might be determinative as to whether a kidnapping existed. Because of the common elements it is difficult to clarify the situation by reliance on whether the movement was incidental to the lesser underlying crime or to kidnapping and the character and purpose of the movement might be vitally important. What this factor might be we shall consider as we turn to the third possibility, kidnapping.

As we describe the kidnapping possibility, it is useful to bear in mind the New York Court of Appeals' definition of "traditional" or "conven-

tional" kidnapping focusing on extortion, murder or taking hostage. Did the charged confinement here relate more to confinement for the sake of confinement or for the sake of assault or more to the idea of extortion, murder or taking hostage? A jury would not easily find murder in the picture, but might find that extortion or taking hostage was clearly in the picture more so than assault or confinement for confinement. The scenario opens with the defendant complaining about grievances and ends with his discussing them with the warden, the press and others. Grievances might be found by a jury to be the reason for the charged confinement and actual movement.

Was Dembosky taken hostage and was his body's safety used as a fulcrum to attempt to lever a hearing and hopefully redress of grievances? Was Inspector Dembosky moved to the hospital room insulated from sniper fire, where ingress and egress of officials and press could be controlled by defendant and where there was a telephone with which defendant could communicate safely with prison officials and the outside world to attempt to extort redress of grievances? If these questions were answered affirmatively on the facts by the jurors under proper instructions, the underlying crime might be a kidnapping of taking Inspector Dembosky as a hostage to extort more favorable conditions and the movement to the secluded telephone-supplied room as incidental not to any lesser crime but to a kidnapping.

It would be the function of the jury to weigh the evidence presented to it in the light of the court's charge in order to determine whether the real crime herein involved was a minor one and the movement incidental thereto, or whether the real crime did indeed involve the taking of a hostage in

order to extort something of value and that the movement was an asportation incidental to committing a kidnapping.

## VI. SUFFICIENCY OF THE INFORMATION

Having determined that in this case in addition to confinement there must be asportation, we turn to the question of the sufficiency of the information. Was the information incomplete in that it did not specifically charge asportation?

The New York case of *People v Weiss,* 252 App Div 463, 467–468; 300 NYS 249, 254–255 (1937) reversed on other grounds 276 NY 384; 12 NE2d 514 (1938) is instructive.[7] Appellants were convicted of the crime of kidnapping under New York law.[8] In discussing the appellants' attack on the indictment, the Court stated:

"Appellants attack the sufficiency of the indictment and contend that under the statute a specific criminal intent to cause the victim to be confined is an essential element of the crime of kidnapping and must be pleaded. They urge that since the indictment fails to allege such specific intent it is insufficient in law. There can be no doubt that, when a particular intent accompanying an act is requisite to constitute a crime, it *should be alleged.* It is likewise true that, under the statute, to constitute the crime of kidnapping there

[7] In reversing the conviction and remanding for a new trial, the New York Court of Appeals did not concern itself with the sufficiency of the indictment. Rather, it reversed on the fact that defendants did not have an opportunity to testify as to whether they believed in good faith that they were acting under the authority of law.

[8] The statute (§ 1250, Penal Law) so far as material provides:

"A person who wilfully:

"1. Seizes, confines, inveigles, or kidnaps another, with intent to cause him, without authority of law, to be confined or imprisoned within this state, or to be sent out of the state or to be sold as a slave, or in any way held to service or kept or detained, against his will;
* * *

"3. * * * Is guilty of kidnapping."

must be the willful and unlawful seizing of a person against his will with intent to cause him to be confined, imprisoned, or detained within the state. People v. Hope, 257 N.Y. 147–150, 152, 177 N.E. 402, 403 [1931]; Hadden v. People, 25 N.Y. 373 [1862]. In People v. Hope, supra, there are dicta to the effect that the intent with which the victim was seized and confined must be pleaded. I believe the absence of such an allegation is not fatal where, as here, it is alleged that on February 14th Wendel was seized against his will and without authority of law and actually confined and detained against his will and without authority of law until February 24th. The statute requires seizure with intent to confine. Seizure alone is not sufficient. But where seizure and actual confinement against the victim's will and without authority of law are alleged, the unlawful intent appears, it is implicit in the indictment, and the crime defined by the statute is sufficiently pleaded; and if those facts are established the crime is proven. *In determining the sufficiency of an indictment the test is: Does it identify the charge against the defendant so that his conviction or acquittal will bar a subsequent charge for the same offense; does it notify him of the nature and character of the crime with which he is charged so as to enable him to prepare his defense and to permit the court to pronounce judgment according to the right of the case?* People v. Farson, 244 N.Y. 413, 155 N.E. 724 [1927]; People v. Williams, 243 N.Y. 162, 153 N.E. 35 [1926]. In applying this test courts should be liberal, not technical. Thus construed, the indictment is sufficient and the defendants were not prejudiced by the failure to plead the crime charged in the identical words of the statute. To hold otherwise would be to sacrifice substance to form and 'abandon much that has been accomplished to simplify procedure upon criminal trials.' People v. Marcus, 235 App. Div. 397, 400; 257 N.Y.S. 424, 428 [1932]." (Emphasis added.)

In applying the *Weiss* test, we hold that the information was sufficient but not exactly a standard for emulation. The charge against defendant was based on the wording of the kidnapping stat-

ute. The exact language of the statute was used.
Defendant knew of the nature and character of
the crime he was charged with. If the Court of
Appeals' reversal of conviction is affirmed by this
Court, he will not be able to be again charged with
this crime of kidnapping.

There is no contradiction between the *Weiss* test
and 1963 Const, art 1, § 20 which provides in part:

> "In every criminal prosecution, the accused shall
> have the right * * * ; to be informed of the nature of
> the accusation; * * * ."

See *Haskins v Ralston,* 69 Mich 63, 67 (1888).
Indeed *Weiss* merely fleshes out the skeletal con-
stitutional minimum. Since defendant's constitu-
tional rights were not violated, any other minor
defects in the information were waived by the
pleadings. *People v Collins,* 380 Mich 131 (1968); *In
re Hoffman,* 326 Mich 368 (1949). As was stated by
Justice BRENNAN in *Collins:*

> "[T]his Court will not regard as the basis for a new
> trial or reversal of a conviction any *procedural error*
> which does not result in a miscarriage of justice. GCR
> 1963, 529; CL 1948, § 769.26." 380 Mich 135. (Emphasis
> added.)[9]

## VII. SUFFICIENCY OF THE CHARGE

The purpose of the court's charge to the jury is
to explain the issues and the legal principles appli-
cable to the facts in issue. The trial judge did not
allude to asportation in his charge. He charged the
jury:

---

[9] MCLA 769.26; MSA 28.1096 provides:

"No judgment or verdict shall be set aside or reversed or a new
trial be granted by any court of this state in any criminal case, on the
ground of misdirection of the jury, or the improper admission or
rejection of evidence, or for error as to any matter of pleading or
procedure, unless in the opinion of the court, after an examination of
the entire cause, it shall affirmatively appear that the error com-
plained of has resulted in a miscarriage of justice."

"While the testimony in this case has covered a wide range of facts and circumstances, the real issues for your determination are rather narrow ones and they may be stated briefly as follows:

"Did the defendant wilfully, maliciously and without lawful authority forcibly confine or imprison Inspector Dembosky against his will?

"Or did the defendant aid and abet others in wilfully, maliciously and without lawful authority forcibly confining or imprisoning Inspector Dembosky against his will?"

As decided above, asportation is a question of fact. It is also an essential element of the crime. "It is the duty of a trial court in charging a jury as to the elements of an offense, and what must be proved in order to establish such elements, to do so accurately." *People v Tolewitzke,* 332 Mich 455, 458 (1952).

Considering the charge as an entity, it was inadequate. The jury charge should have included the question of whether the necessary asportation was present.

The trial court is reversed, the Court of Appeals is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH and SWAINSON, JJ., concurred with WILLIAMS, J.

T. E. BRENNAN, J. *(dissenting).* This case is simply not an appropriate vehicle to carry the rule of law which the Court of Appeals, and now this Court, has decided to promulgate.

There was no discussion of asportation at the trial of this cause. Otis Adams defended on the ground that he had nothing to do with the original

assault, and participated in the event only out of fear and under duress.

The information was drawn and the jury was charged in the language of the statute. No objection to the charge was made by defense counsel with reference to the question of asportation.

On appeal, five errors were assigned:

"I. Did the trial court commit prejudicial error in allowing the prosecutor to display to the jury certain knives before said knives were introduced into evidence?

&ast;   &ast;   &ast;

"II. Did the trial court commit prejudicial error in allowing into evidence knives surrendered by inmates other than the Defendant?

&ast;   &ast;   &ast;

"III. Did the trial court commit prejudicial error in admitting into evidence testimony of one Robert Hubbard relating to an alleged beating administered to Robert Hubbard by the Defendant?

&ast;   &ast;   &ast;

"IV. Did the trial court commit prejudicial error in refusing to give a requested instruction on intoxication as a defense?

&ast;   &ast;   &ast;

"V. Did the trial court commit prejudicial error in refusing to give a requested instruction on a lesser includable offense?

&ast;   &ast;   &ast;"

The Court of Appeals, on its own motion, requested briefing of two additional issues:

"1. Whether, under MCLA § 750.349 [MSA 28.581], kidnapping can be committed without either an asportation or secret confinement of the victim.

"2. If an asportation is required, do the facts in the instant case constitute an asportation sufficient to es-

tablish the offense of kidnapping? See *People v Levy* (1965), 15 NY2d 159 (256 NYS2d 793); and *People v Daniels* (1969), 71 AC 1165 (80 Cal Rptr 897)."

In response to the requested briefing, defendant filed a supplemental brief, which concluded as follows:

"It is the contention of the defendant-appellant that the facts in the instant case do not constitute asportation necessary to establish the offense.

"The defendant-appellant does admit that the facts in the case at bar would not support a *Levy-Daniels* argument. The assignment of error that the trial judge refused to grant instructions as to a lesser included offense is herein reiterated; but the defendant-appellant does not argue that the real crime committed in this case was felonious assault and not kidnapping. Defendant-appellant has no argument with the People's opinion that if a reversal of this conviction is in order that *People v. Shaw* (1968), 11 Mich. App. 255, 160 N.W. 2d 761 should also be reconsidered and overruled. The facts upon which *Shaws'* plea was affirmed are the same which buttress Adams' conviction.

"The reason cited by defendant-appellant for the reversal of both cases is this: The asportation necessary to convict in a kidnapping situation cannot possibly be present where all movement of the victim by the kidnapper had its origin and terminus wholly within the confines of a walled enclosure. The facts in the instant case are indisputed. Inspector Dembosky's movements initiated by *Adams, et al.* began and ended all within the confines of the State Prison of Southern Michigan. Defendant-appellant cites no cases for this proposition, but can put forward no better argument after an exhaustive review of the *Levy-Daniels* and related cases."

Despite defendant's lack of enthusiasm for the bench-suggested line of argument, the Court of Appeals concluded that the facts did not support an asportation sufficient to warrant conviction of kidnapping.

Now this Court injects still another unsolicited dimension to the lawsuit. We reverse for new trial upon a claimed omission from the trial court's instruction never brought to the attention of the trial judge either by requested instruction or objection to the charge; never briefed nor argued in the Court of Appeals by the litigants either before or after the enlargement of the issues by that Court, *sua sponte;* and never argued nor briefed in this Court.

The issue of asportation was not before the Court of Appeals. The sufficiency of the trial court's instruction is not before us.

Perhaps the reason why no such issues were made at trial was the simple fact that no one connected with the case doubted that the seizure of the prison official, his forced march at knife point for over a quarter of a mile, and his confinement under guard as a hostage for several hours, constituted kidnapping.

The disputed issue in this case was not whether Inspector Dembosky was kidnapped. It was whether Otis Adams was one of those who kidnapped him.

By attempting to use this lawsuit as a vehicle to pronounce a new definition of the crime, we force a square peg into a round hole.

By sending it back for new trial, we impose upon able counsel on both sides and upon the trial court a brand new lawsuit, to be tried upon a brand new theory.

I would affirm the conviction.

LEVIN and M. S. COLEMAN, JJ., did not sit in this case.