PEOPLE v LUCILLE WALKER

PEOPLE v TERESA WALKER

PEOPLE v COLLINS

Docket Nos. 66615, 67677, 71998. Submitted January 3, 1984, at Lansing.—Decided June 18, 1984. Leave to appeal denied, 419 Mich __.

Lucille Walker, Teresa Walker, Lidra Walker and J. C. Collins were tried on three counts of kidnapping and Lucille Walker, Teresa Walker and J. C. Collins were convicted on all three counts, Oakland Circuit Court, Hilda R. Gage, J. Defendants appealed. *Held:*

Secret confinement is an alternative to the asportation element of kidnapping, but either must be accomplished by force, that is, by physical coercion amounting to more than mere mental coercion. There was insufficient evidence to support a finding of either forcible asportation or secret confinement.

Reversed.

R. S. Hoffius, J., dissented. He would hold that there was sufficient evidence to support the convictions and would not disturb them.

Kidnapping — Asportation — Secret Confinement — Force.

Secret confinement is an alternative to the asportation element of kidnapping, but either must be accomplished by force, that is, by physical coercion amounting to more than mere mental coercion (MCL 750.349; MSA 28.581).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Robert F. Davisson,* Assistant Prosecuting Attorney, for the people.

References for Points in Headnote

1 Am Jur 2d, Abduction and Kidnapping § 14.

Necessity and sufficiency of showing, in kidnapping prosecution, that detention was with intent to "secretly" confine victim. 98 ALR3d 733.

State Appellate Defender (by *Derrick A. Carter),*
for defendant Lucille Walker.

*Auslander, Babcock & Weiss* (by *Ira S. Auslander* and *Joel H. Kaufman),* for defendant Teresa Walker.

*Arthur James Rubiner,* for defendant J. S. Collins.

Before: M. J. KELLY, P.J., and ALLEN and R. S. HOFFIUS,* JJ.

M. J. KELLY, P.J. Defendants-appellants, Lucille Walker, J. C. Collins, and Teresa Walker were convicted by a jury of three counts of kidnapping, MCL 750.349; MSA 28.581. Each defendant was found guilty on all three counts. A fourth defendant, Lidra Walker, was found not guilty. Lucille Walker was sentenced to 4 to 20 years in prison, J. C. Collins was sentenced to 3 to 20 years in prison, and defendant Teresa Walker to 6 months in the county jail and 2 years probation. These three appeals of right have been consolidated as the defendants were tried together. Our review of the record and briefs indicates that Lucille Walker was clearly guilty of federal and state civil rights violations and exploitation of the elderly, and probably guilty of larceny by trick and embezzlement, false personation, and perhaps other crimes, but not kidnapping. (We defer to the prosecutor's exercise of discretion in the matter of what crimes to charge, but if there is inadequate legislation in this regard it should be brought to the attention of the Legislature.)

Since we find the elements of kidnapping missing we reverse all three convictions.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

*Facts*

Defendant's penchant for using aliases casts her conduct in suspicion. Lucille Walker is her legal name. She had apparently been born Lucille Cora Galvin and used the names Cora Galvin and Lucille Collins in her Miami activities and on her Florida bank accounts. She was also known variously as Miss Ross, Mrs. Miller, and Sylvia Kemble. Hereafter she will be referred to as defendant. At best, the picture of defendant emerges as an opportunist with regard to the infirm elderly. She operated an "adult congregate living facility" in Miami, Florida, for which she obtained a one-year license on October 31, 1980. She also maintained a home for herself and defendant J. C. Collins (principally called Taft Collins) in Coral Gables, Florida. The two were never married but had lived together for many years. Defendant also had ownership interests with Collins in homes in Detroit and Oak Park, Michigan.

The genesis for her scheme or scam is best highlighted by the testimony of Sylvia Goldstein. Witness Goldstein was 74 years old at the time of trial. She had lived in defendant's nursing/boarding home in Miami during 1979 and 1980. She paid defendant $800 a month for room and board. Defendant and Collins purchased the house at 13341 West 10 Mile Road in Oak Park sometime in June of 1981 and defendant brought Mrs. Goldstein to the 10 Mile address where she continued to pay the $800 per month. She voluntarily and willingly came to Detroit. She said she was well treated and liked it at the house on 10 Mile Road.

Defendant's success with Sylvia Goldstein and with another elderly but incompetent lady (Marian Rumsford), who was brought up after Mrs. Goldstein and before the complainants, apparently

prompted defendant to try it with four other residents of her Miami boarding house. These were 65-year-old Felicia Beneteau, 63-year-old Grace Chamberlain, 91-year-old Kathe Klassen, and 75-year-old Lillian Mizner. Two were receiving federal social security benefits and three had been living in defendant's Miami boarding house for weeks to months. Mrs. Mizner apparently was not receiving social security benefits, but owned her own home in Miami and had a bank account containing approximately $5,000 in savings.

Mrs. Mizner gave the strongest testimony against defendant. She testified that she first met defendant when defendant appeared on her doorstep in July of 1981 and identified herself as a social security investigator. She stated that defendant wanted to take her to the bank. Neighbors of Mrs. Mizner testified that they brought her to the defendant's Miami boarding home in late July of 1981. Mrs. Mizner paid $400 to defendant for her first month's lodging, but was only at the home three days before she was transported with the others to Detroit.

The kidnapping charges concerned Mrs. Mizner, Grace Chamberlain, and Felicia Beneteau, as Kathe Klassen was declared incompetent to testify at the preliminary examination and was dropped as a complainant. We find that the complainants' testimony did not establish the charges.

The four women were taken to the airport in Miami on August 1, 1981, and were accompanied on a Delta Airlines flight by defendant Teresa Walker, Lucille's grandaughter. The group was met at the airport in Detroit by Teresa's boyfriend and driven to the 10 Mile Road house in Oak Park where they remained a little less than two weeks. Defendants Lucille Walker and J. C. Collins did

not fly with the group and did not arrive at the 10 Mile Road address until August 4, 1981.

The ladies' perception of the trip from Miami to Detroit was the object of major emphasis by all defendants, but it is clear from the record that none protested and, although all felt manipulated, only Lillian Mizner thought she had been kidnapped. Mrs. Mizner testified that she had no intention of leaving Florida but that, when it became apparent at the airport that they were getting on a plane for Detroit, she did not "feel it would be any use to say a word". She also gave the following testimony:

"*Q.* As you got to the airport, did you say something to anyone?

"*A.* Well, I said to them, to anyone at large, I said, 'this looks like a kidnapping for ransom'.

"*Q.* Who did you say that to?

"*A.* To the car in general, but I got no response.

\* \* \*

"*Q.* Why did you say, this seems like a kidnapping for ransom?

"*A.* Well, it was very obvious.

"*Q.* What do you mean?

"*A.* Why would we be taken to another city, transported over state lines, if there was not something suspicious about it?"

No one else in the car testified to having heard Lillian Mizner drop that verbal bomb, and on cross-examination she diluted the impact of that testimony by saying that she made those remarks when she got on the plane. She defined kidnapping: "We were put on a plane and transported over state lines." She further testified:

"*Q.* Did you see any policemen or guards posted at the airport?

"*A.* Oh, plenty of them and everything.

"*Q.* Did you say anything to them?

"*A.* I did not. I didn't feel it was going to be a bit of use. She was going to say we're incompetent and she was in charge of us."

By necessity Mrs. Mizner referred only to Teresa Walker because she alone accompanied the four elderly ladies onto the airplane. Mrs. Mizner testified she knew they were going to Detroit when she saw the sign at the Delta ticket counter in the Miami Airport.

Mrs. Mizner's brother-in-law, Leo Caron, age 69, lives in Quebec. He testified that he and his wife received a phone call the night of July 31, 1981, from a "Cora Galvin" who said Lillian was well and with her at the boarding home and asked him to try to get a lawyer to sell Lillian's house. He spoke with Lillian on the phone and reported that Lillian "sounded nervous, quite nervous, and she said she didn't want to go to Detroit and that they were going to put her through a psychiatric test. She certainly didn't want that". Mr. Caron also gave some fairly confusing testimony. He said he may have received another phone call from a Mrs. Miller saying Lillian was going to Detroit. He had an address for a house at 23591 Jerome in Detroit, which was later identified as Lidra Walker's house, also located in Oak Park, about 3/4 of a mile from the 10 Mile Road address. (Lidra, Lucille's daughter, was also prosecuted in this case but was found not guilty by the jury). Mr. Caron had a phone number with which to reach Lillian in the Detroit area, but it is not clear from the record whose phone that was. He also was told by someone, presumably Mrs. Miller, to call Attorney

Arnold Weiner, a suburban Detroit area attorney. He believed that his sister-in-law was located at 2433 East Grand Boulevard in Detroit and that he knew how to reach her by phone. (The 2433 East Grand Boulevard address turned out to be a vacant lot, but defendant and J. C. Collins at some time had a house on East Grand Boulevard).

Mrs. Mizner's Miami neighbor, John Boston, testified he spoke with Mrs. Mizner on Friday, July 29, 1981, shortly after bringing her to defendant's boarding house. He said she appeared "afraid to talk" and "a little shaken" but she declined his offer to bring her back home with him.

A social worker in Florida, Eva Vidana, had placed the elderly ladies with defendant Lucille Walker and when she discovered the ladies had been removed from the boarding house she filed a missing persons report with the Miami police. The story became a media event and was heavily publicized all over the country. Around 2 a.m. on the night of August 13, 1981, the three complainants plus Marian Rumsford and Kathe Klassen were driven to Detroit Receiving Hospital and abandoned there after widespread television coverage to the effect that five elderly women were missing from a nursing home in Florida and thought to be in the Detroit area. It is not clear who drove them to the hospital. One of the ladies testified that defendant Teresa Walker drove them, another testified that defendant Collins drove them, defendant Lucille Walker suggested that Ed Sosnowski and James Miles transported the ladies after seeing their story on a television broadcast.

Conditions in the house on 10 Mile Road where the women were living were the subject of much conflicting testimony. Each of the three complain-

ants testified that she and three other ladies lived in the basement. One of the women identified the fourth lady as Marian Rumsford, two others said it was Kathe Klassen. Edward Sosnowski, a live-in handyman at the 10 Mile Road house, testified that some of the ladies lived in the basement. All of the defendants testified that only two ladies lived in the basement, those two were smokers and lived in the basement to accommodate their habit.

There was a leaky toilet in the basement and a plumber testified that he went to repair the toilet on August 4, 1981. He said that he saw several elderly women downstairs, that he was there about an hour, that the women were watching television, lying on their beds, or just walking around and that he spoke to them and found nothing to indicate that the ladies were being kept against their will.

The house had more than one phone. The ladies testified that they were told not to use the phone and that they were told not to go outside. Mr. Sosnowski said he told the ladies they could not go outside and they accepted that. But he also testified that the door was never locked except on the occasions when he left the premises. Two of the ladies testified they had never tried the back door to see if it was locked, but Lillian Mizner testified that Felicia Beneteau did try the back door and found it bolted. Grace Chamberlain said that she complained to defendant that they wanted to go back to Florida. Defendant told her that they could not get a flight due to the air traffic controllers' strike.

Either defendant arranged an attorney interview to try to obtain a power of attorney or Mrs. Mizner said she wanted to talk with an attorney, so defendant arranged an interview with Mr. Ar-

nold Weiner. Mrs. Mizner testified on direct exami-
nation that she told him she was being kidnapped,
but on cross-examination admitted that she said
nothing about her current living situation to the
attorney, that all she talked about was her money
and her Florida property. Defendants also took
Kathe Klassen to a bank in Oak Park, Mrs. Miz-
ner accompanied them, and neither said anything
to the people at the bank about their current
living conditions.

It appears from the testimony that the house
doors had locks but were often unlocked. Each
lady admitted she had never tried to open any of
the doors herself. Mrs. Mizner testified that, if
they asked defendant if they could go outside and
she said yes, they could and did and they did sit on
the back porch.

There appear to be two primary legal issues.
The first is whether kidnapping can be accom-
plished without force, and the second is whether
the defendants inveigled the complainants into
secret confinement or imprisonment. Stated an-
other way the issue is whether there was sufficient
evidence of each of the elements of kidnapping to
sustain the convictions.

"When determining whether there is sufficient evi-
dence to support their convictions, this Court must view
the evidence in a light most favorable to the prosecu-
tion and determine whether a rational trier of fact
could have found that the essential elements of the
crime were proven beyond a reasonable doubt." *People
v Delongchamps,* 103 Mich App 151, 159; 302 NW2d 626
(1981).

The Michigan kidnapping statute, MCL 750.349;
MSA 28.581, states:

"Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years."

### *Force*

As the Supreme Court aptly noted in *People v Adams,* 389 Mich 222, 229; 205 NW2d 415 (1973), "this statute is not a model of clarity". The statute basically describes five different categories of kidnapping (see CJI, p 19-14); the trial court read to the jury the first and the fourth:

"The defendants are charged with the crime of kidnapping. Any person who shall wilfully, maliciously and without lawful authority, forcibly or secretly confine or imprison any other person within this state against her will, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned in this state against her will is guilty of this crime."

The information on which defendants were prosecuted charged that defendants "did wilfully, maliciously and without lawful authority forcibly confine and/or secretly confine and/or imprison" each of the complainants against her will by transporting them from Florida "by fraudulent means and/ or against her will and did then and there forcibly secret *[sic]* or confine [complainant] in a house

located at 13341 W. 10 Mile Road in Oak Park * * *". This contains elements of the first, second, and fourth categories of kidnapping (the third involves kidnapping for ransom, the fifth, involuntary service).

The trial court's instructions to the jury on the elements to be proven in the case at bar were essentially those contained in CJI 19:1:04:

"First, the victim must have been forcibly confined or imprisoned, or the victim must have been secretly confined.

"Second, the victim must have been confined or imprisoned against her will and without lawful authority.

"Third, during the course of such confinement, the defendant must have either forcibly moved the victim or caused her to be moved from one place to another for the purpose of a confinement or imprisonment by the use of fraud, deception or inveiglement.

"Or must have hidden the victim and kept her in secret confinement.

"Movement is not sufficient if it is part of a crime other than kidnapping. The evidence must convince you beyond a reasonable doubt that the movement was for the purpose of abduction and kidnapping alone and not for any other crime.

"Fourth, during the course of such confinement the defendant must have kept the whereabouts of the victim secret. In determining whether the victim was so imprisoned, you should consider whether there was confinement, its length, whether other persons not so confined were made aware of the location of the victim, and whether this secrecy of confinement, if any, added any greater danger to the victim.

"Fifth, at or during the time of such confinement the defendant must have intended to so kidnap or confine the victim.

"Sixth, at the time of such confinement the defendant must have been acting wilfully, maliciously and without lawful authority. Wilfully and maliciously means the defendant intentionally confined the victim, knowing

such confinement to be wrong, and that he or she did so without legal justification or excuse."

However, the Criminal Jury Instructions which were prepared to go with the first or fourth sections of the statute contain only five elements. The trial court added, as its "third" element, asportation, which is found in the CJI for other sections of the kidnapping statute, but nowhere with the phrase "by the use of fraud * * *".

The Supreme Court held in *Adams, supra,* p 238, that secret confinement is an alternative to the asportation element of kidnapping. The CJI commentary notes that secret confinement is rarely the basis for a kidnapping prosecution and there are no reported cases. The prosecution sought to prove that the ladies were either forcibly or secretly confined. The prosecutor's briefs on appeal define force as including "fraud or duress or threats". The prosecution cites no authority for this expanded definition of force. The record simply does not support the prosecutor's assertions that the ladies were threatened. At most, the ladies' testimony, while failing to indicate that threats were made, does indicate that they felt that complaints would be futile because, if they complained, they would be characterized as incompetent by the defendant.

Fraud generally connotes false representations which induce another to part with something of value. Grace Chamberlain testified that defendant first told her she was going on an overnight trip, then later mentioned a vacation and a picnic. Whether any of this induced Grace to go on the airplane is unclear since she also testified that she did want to get out of the Miami home for a change. Felicia Beneteau testified that she had been told that they were going to Detroit on a

vacation. On the whole the testimony suggests that none of the ladies had a clear idea where they were going when they left Florida. Neither Lillian nor Felicia told defendant that they did not want to go; both testified that this was due to a fear that it would be useless to object because they were in defendant's care and were compelled to do what defendant told them to do. Their testimony suggests that, if they had known exactly where they were going and what they would do there, they still would have gone. Perhaps this sense of compulsion stemmed from their own lack of choices. The only one who apparently had anyplace else to go was Mrs. Mizner and she declined the Bostons' invitation to come back to their home. She clearly had an alternative which she had refused. She had been staying at the Bostons' for about a year before going to the boarding house in Miami. On cross-examination Mrs. Mizner indicated that although she did not say that anyone had threatened or forced her "there is such a thing as coercing".

Duress is distinct from fraud in that a party under duress acts knowingly but unwillingly whereas in fraud the party acts willingly but on false representations. The ladies' responses in this case seem more akin to duress since they had at least some idea that they were going on a trip but apparently some did not want to go initially and some did not like ending up in the basement. We do not believe that mental coercion stemming from the defendant's exercise of assumed authority over these complainants satisfies the force requirement of the kidnapping statute.

Cases cited in 1 Am Jur 2d, Abduction and Kidnapping § 13, pp 51-52, indicate several state courts have extended "force" to include threats,

fraud and duress. We decline to extend the mean-
ing of the term force to include mental coercion as
opposed to physical coercion on the facts of this
case. There is no evidence that the ladies' confine-
ment at the house in Oak Park was based on the
use of threat or force. It appears that the ladies
obeyed simply because they were told to. There is
no evidence of what would have happened to them
if they did not obey. We hold that defendant's
exercise of assumed authority over these ladies did
not create a duress sufficient to constitute forcible
confinement as used in the statute.

### Secret Confinement

It is obvious that we are not here dealing with
kidnapping in the conventional sense. These
women were not forcibly seized and removed to a
hiding place for the purpose of extortion. They
were transported openly in tourist class seats on a
Delta Airlines flight which was filled to capacity
from Miami via Ft. Lauderdale to Detroit Metro-
politan Airport. They exited through a public ter-
minal. If there was any secret confinement it must
have occurred in the first instance when the ladies
left the airport and were transported in a private
automobile to the house on 10 Mile Road. The
ladies admitted that while at the house they saw,
but did not complain to, an attorney, a bank clerk,
two plumbers, a gas company meter man, and two
handymen. The caretaker/handyman, who lived in
the house and who would have to be construed as
their jailer, Mr. Ed Sosnowski, was not charged.
He and others testified that there were working
phones in the house. Defendant said that there
were four phones; this was not contradicted. The
complainants testified that they were not allowed
to use the phone and Mr. Sosnowski testified that

he told them not to use the phone. None of the defendants attempted to use the phone. On cross-examination one defendant said she never asked whether she could use the phone because "I didn't have anybody to call". One of the complainants had a nephew in Lincoln Park whose phone number she knew and could have dialed but never did. When Mrs. Mizner was taken to see a lawyer she apparently never discussed her situation at the 10 Mile Road address with the lawyer. She talked only about her Florida real estate and her money. Two of the complainants were taken to a bank where according to the testimony of an employee of the bank a joint account was opened for 91-year-old Kathe Klassen with defendant under the name of Lucille Collins. No protestations were offered. The house itself was located on a busy street, very near a shopping center with neighbors next door and no curtains on the basement windows, and the ladies were often left alone and could have walked out of the house on any number of occasions. Certainly, they could have picked up the telephone and dialed zero at almost any time. There were many windows to the world open to them.

The prosecution contends that the failure of the ladies to communicate with anybody does not mean that the confinement was not secret because the ladies did not communicate out of fear. No cases are presented in support of this proposition and we have found none concerning a confinement similar to the case at bar, that is to say, where no physical force was involved. The Missouri Supreme Court construing Missouri's kidnapping statute, which is similar to Michigan's, decided:

"Secret confinement, within the meaning of § 559.240, does not require proof of total concealment and complete isolation whereby the victim is rendered invisible

to the entire world. It is sufficient to show that the person kidnapped has been effectively confined against his will in such a manner that he is prevented from communicating his situation to others and accused's intention to keep the victim's predicament secret is made manifest." *State v Weir,* 506 SW2d 437, 440 (Mo, 1974).

The court held that driving a woman through Kansas City streets to an open field and preventing her from waving or signaling to others constituted secret confinement. The opinion does not indicate how that defendant "prevented" the victim from waving. An unhelpful opinion from the Mississippi Supreme Court in *Hinson v State,* 360 So 2d 934, 935 (Miss, 1978), simply stated that a "careful review of the record discloses no evidence, none at all, of secret confinement", without explaining what evidence might constitute secret confinement or what evidence was in the record. In another Mississippi case, *Johnson v State,* 288 So 2d 842 (Miss, 1974), the court ruled that transporting a man at gunpoint by car from a place where he had a right to be to a place unknown to his friends and acquaintances satisfied the requirement of secret confinement.

We decline to construe secret confinement so broadly as to include an occurance in the presence and in the view of so many witnesses as were present and testified in this case. The only Michigan case on point, *People v Nodine,* 36 Mich App 80; 193 NW2d 172 (1971), decided that the victim's testimony that defendant held undercover agents at bay in his apartment at gunpoint was sufficient evidence to satisfy either the forcibly confined or secretly confined elements or both. That case establishes no precedent for elasticizing the word secret so that it blurs into the word silent.

We do not think it was the intention of the Legislature to apply the kidnapping statute to a situation where these defendants overbore the wills of ladies assigned to their adult care facility. We perceive the situation to be an exercise of assumed authority over the ladies, which these defendants clearly did not have, to remove them from a licensed home in Florida to an unlicensed facility in Michigan. Exploitation of these elderly persons, clearly wrongful, cannot be converted into kidnapping on this record. All of the complainants admitted going along with defendant's plans, either because they were excited by the change from monotony, or because they had no one to call, or because they felt it would be futile to protest to anyone.

Having found no forcible seizing or confining and no secret confinement within the meaning of the kidnapping statute, we find it unnecessary to address any of the other claims of error urged by the defendants in this case.

Reversed.

ALLEN, J., concurred.

R. S. HOFFIUS, J. *(dissenting).* I dissent. The case was submitted to the jury on proper approved standard jury instructions. On the facts of this case, there was sufficient evidence for the jury to find the defendants guilty. The jury found three defendants guilty and acquitted the fourth defendant. I would not upset the verdict.