9 F.3d 106
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James S. Lee ANDERSON, now known as Ahmad Ibn Anderson,
Petitioner-Appellant,
v.
Sherry L. BURT, Warden, Ryan Regional Correctional Facility,
Detroit, Michigan, Respondent-Appellee.
 Nos. 92-1847, 92-1848.
 United States Court of Appeals, Sixth Circuit.
 Oct. 21, 1993.
 
 Before: KEITH, GUY, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner, James S. Lee Anderson, now known as Ahmad Ibn Anderson, appeals the denial of his petition seeking a writ of habeas corpus. Anderson sought habeas relief under the following theories: he was deprived of both the right of confrontation and a fair trial when the prosecutor informed the jury of a conversation he allegedly had with a defense witness; he was denied due process and equal protection of law in light of the trial court's incorrect jury instruction as to the elements of kidnapping; he was deprived of a fair trial by the ineffective assistance of trial counsel; and he had ineffective assistance of counsel on direct appeal. After reviewing Anderson's claims of error, we conclude that denial of the writ was proper and we affirm.
 
 I.
 
 2
 On the evening of May 21, 1976, Debra and Noel Jackson went with their friends, Marcia and Neil Grausam, to a birthday party. The two couples travelled together to the party in the Jacksons' car. Afterwards, they drove to the Jackson's residence in Lincoln Park, Michigan, at about 2:30 or 3:00 the following morning.
 
 
 3
 As Marcia Grausam left the Jacksons' automobile and started walking toward her own vehicle, a man came out from behind the bushes and grabbed her. At that moment, the rest of the group was standing outside of the Jacksons' car, engaged in conversation. When Marcia screamed, the assailant told everyone to get back inside the car, threatening to shoot Marcia if they did not obey. He then ordered the group to give him all of their money, which they did. After taking the money, the assailant told Debra Jackson to get out of the car and to walk over where he was standing. If she did not comply, the assailant stated: "I have a gun, I will kill her if you don't do what I say." (App. 315.) Fearful for her friend's safety, Debra followed his instructions. The man then directed the two women to accompany him. Noel Jackson jumped out of the car and told the assailant to take him instead of the two women. The man told Noel that he would let them go in half an hour if police were not called.
 
 
 4
 The two women followed the assailant a short distance to a car parked in the middle of the road with its lights off. He ordered them not to look at the license plate number, but Debra Jackson observed that it was DSN 481. The women were forced onto the back floor of the vehicle. The assailant drove for about five or ten minutes before stopping. He told Debra and Marcia to take off their socks, and blindfolded them with the knee socks that Marcia was wearing. He then demanded their jewelry. After inspecting Debra's watch, and engagement and wedding rings, he handed them back to her, while keeping her house keys. The assailant then told the women to take off their clothes. When they refused, he threatened to kill them. They tried to "rationalize" with the man, but he kept repeating that he would kill them if they did not comply. When Debra started to cry, the man hit her. Anytime that Debra and Marcia did not immediately follow his instructions, they were struck.
 
 
 5
 The assailant forced the two women to engage in oral and anal sex. He then told them that they had to agree to have sexual intercourse with him and sex with each other or he would make them do it and kill them afterwards. At that point, the assailant was on top of Marcia. Debra yelled to Marcia, "Marcia, let's kill him." (App. 325.) Both women struggled as much as they could, pulling the man's hair and scratching him. He started to strangle Debra, and bit and hit her several times. After he told the women that they would be killed if they did not cease their resistance, they stopped. He then had forcible sexual intercourse with both of them. Afterwards, he ordered them to kiss each other from "[their] heads to [their] toes." (App. 327.)
 
 
 6
 The assailant then told them to gather their clothes. He drove for several miles before letting them out of the car. He said that if they talked to anyone about what had happened, he would "come back and get [them]." (App. 328.) They were instructed to lie down in the weeds by the side of the road. If they were not there when the assailant returned in a few minutes, he told them they would be killed.
 
 
 7
 After remaining in place for a brief time, the two women walked to a nearby house and called the police. Debra asked for a pencil and paper to write down the license plate number of the assailant's vehicle. She gave the police the number on the way to the hospital. Marcia, who had picked up the hat the man had been wearing, turned it over to the authorities at the same time.
 
 
 8
 Two days later, Debra Jackson identified petitioner from a spread of six or seven photographs. She also pointed out Anderson in court as the man who had assaulted her. Noel Jackson identified petitioner both in a photospread and in court as the man who grabbed Marcia Grausam. He saw Anderson's face four times in the span of five or ten minutes. When Anderson bent over to take Noel Jackson's money, he was no more than a foot and a half away. His face was uncovered. Additionally, Noel Jackson stated that the vehicle he saw drive away with the two women looked like a Ford Torino or a Mercury Montego. A 1972 Ford Torino with license plate number DSN 481 was traced to Anderson.
 
 
 9
 Marcia Grausam also identified petitioner in a photospread and at trial as the man who attacked her. She had taken her blindfold off for a time in Anderson's car and had a clear view of his face. She identified Anderson's hat as the one the assailant had been wearing.
 
 
 10
 Neil Grausam gave testimony at trial that was consistent with the accounts provided by the other victims. He did not get a good look at the assailant because he was on the other side of the Jackson's car at the time the attack commenced. As a result, he was unable to make an identification.
 
 
 11
 Semen was found on the bib overalls belonging to Marcia Grausam and on her vaginal and anal smears. The blood type from the overalls and the vaginal smears was AB and A. Marcia was an A secretor, while petitioner was an AB secretor. Consequently, the semen could have come from Anderson. A blood type from the anal smears could not be determined. Likewise, test results from smears taken from Debra Jackson and from seminal fluid found in the back seat of Anderson's Ford Torino were inconclusive. However, hairs discovered in the back seat of the car were microscopically consistent with hairs from Debra Jackson's head. Other samples of hair found in the vehicle were different and could not be tied to either Marcia Grausam or petitioner.
 
 
 12
 Anderson was arrested in November 1987 in Savannah, Georgia. At the time of his capture, he was living under the name of "Keith Carter." In 1970, Anderson had been convicted of assault with the intent to rob and of attempted rape. His conviction, however, was reversed and he was granted a new trial. He subsequently pled guilty to attempted rape and was imprisoned for two months in 1975. After his release, he obtained a job at Great Lakes Steel.
 
 
 13
 At trial, Anderson testified that, on the night of the attack, he left work at midnight and spent the night at his sister's house. He stated that he had, in fact, bought a Ford Torino in May of 1976 from Frank Smith, who lived with petitioner's brother. However, he stated that the car developed mechanical trouble, and that it was parked outside his mother's house on the night of the attack. Smith testified that the sale of the car had not gone through, but that it was in Anderson's possession after May 12, 1976. He confirmed that the vehicle's license plate number was DSN 481.
 
 
 14
 Anderson claimed that he first learned he was wanted in connection with the attack on the morning of May 22, 1976. As a result of his experience with his prior case, he felt that he would not be treated fairly, and decided to go to Georgia the next day. He admitted changing his name to "Keith Carter" to hide his identity.
 
 
 15
 On April 17, 1978, Anderson was convicted of two counts of armed robbery, four counts of first degree criminal sexual assault, and two counts of kidnapping. He was sentenced to eight concurrent life sentences. Anderson appealed to the Michigan Court of Appeals, raising two issues: improper admission of a photographic showup, and improper delay of the preliminary examination beyond the statutory limit set out in Michigan. On February 28, 1980, petitioner's convictions were affirmed by the Michigan Court of Appeals. The Michigan Supreme Court denied discretionary review.
 
 
 16
 In 1981 and in 1983, Anderson sought leave to file a motion for a new trial in the trial court. His 1981 motion claimed that he had been deprived of effective assistance of counsel due to his trial attorney's alleged failure to file notice of an alibi defense, to call alibi witnesses at trial, to request an alibi instruction, and to object to an improper kidnapping instruction. The 1983 motion covered essentially the same ground, except that it did not touch upon the kidnapping instruction. On September 13, 1984, the successor trial court judge granted Anderson an evidentiary hearing on his claim of ineffective assistance of counsel, after which the court concluded that petitioner's contention lacked merit.
 
 
 17
 On August 28, 1985, Anderson filed a delayed application for leave to appeal in the Michigan Court of Appeals, arguing that he received ineffective assistance of counsel because of his trial attorney's alleged failure to present an alibi defense and to request an alibi instruction. The Michigan Court of Appeals denied petitioner's application.
 
 
 18
 On July 28, 1989, Anderson filed a motion for a new trial, advancing the allegations at the heart of the instant habeas petition. On February 22, 1990, the successor trial judge denied petitioner's motion. The Michigan Court of Appeals denied leave to appeal and the Michigan Supreme Court declined further review.
 
 
 19
 On July 26, 1991, Anderson filed the instant habeas petition in the United States District Court for the Eastern District of Michigan. A magistrate judge recommended that habeas relief be denied. The district court entered an order accepting the magistrate judge's recommendation and granted judgment to respondent on June 4, 1992.
 
 II.
 
 20
 Anderson contends that he was denied a fair trial and was deprived of his constitutional right of confrontation when the prosecutor, in cross-examining defense witness Frank Smith, acted as an unsworn witness against him.
 
 
 21
 At trial, Anderson asserted that he had worn a mustache and a goatee for the past six years, including during May of 1976. Several members of petitioner's family corroborated his testimony in this regard. This was of significance because the Jacksons and Marcia Grausam all stated that the assailant, whom they identified as petitioner, was clean shaven.
 
 
 22
 Defense witness Frank Smith also testified that Anderson wore a mustache and a goatee around the time of the attack. Under cross-examination, the following colloquy took place:
 
 BY MR. LANG [Prosecutor]:
 
 23
 Q. Do you recall being here Tuesday of this week?
 
 
 24
 A. Yes, I do.
 
 
 25
 Q. Do you recall being out in the hall between sessions?
 
 
 26
 A. Yes, I do.
 
 
 27
 Q. Do you recall me asking you whether you recall whether the Defendant had a mustache and goatee?
 
 
 28
 A. No, I don't recall.
 
 
 29
 Q. Do you recall saying I don't know?
 
 
 30
 A. No, I don't recall.
 
 
 31
 Q. You're denying telling me that out in the hall?
 
 
 32
 A. I never told you that. You never asked me that.
 
 
 33
 MR. HALL [Defense counsel]: Now wait a minute, your Honor. That's a red herring for him to lay that kind of trick in front of the jury.
 
 
 34
 THE COURT: Just a moment.
 
 
 35
 MR. LANG: I'll take the witness stand.
 
 
 36
 THE COURT: Gentlemen, gentlemen. Now, wait a minute. We'll discuss this in the absence of the jury.
 
 
 37
 (App. 369-70). The jury was then removed from the courtroom so that the trial judge could conduct a bench conference. The judge heard arguments concerning defense counsel's objection before ultimately deciding to overrule it. After the jury was brought back in, the prosecutor ceased his previous line of questioning and made no further mention of his alleged conversation with Smith. At the close of the trial, the judge instructed the jury that the arguments of counsel were not to be deemed evidence for purposes of rendering a verdict.
 
 
 38
 "[O]ur scope of review over allegedly prejudicial arguments by state prosecutors is narrow." Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir.), cert. denied, 444 U.S. 936 (1979). In order to prevail, a habeas petitioner must demonstrate that the prosecutor's actions violated the "fundamental fairness essential to the very concept of justice." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974). In determining whether alleged prosecutorial misconduct warrants reversal of a conviction, the harmless error standard is to be applied. See, e.g., Eberhardt v. Bordenkircher, 605 F.2d 275 (6th Cir.1979).
 
 
 39
 Here, the manner in which the prosecutor injected himself into the trial was improper. "[A] government attorney may not express to the jury his personal knowledge of the guilt of the accused, or bring to its attention purported facts that are not in evidence and are prejudicial." United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976). From the prosecutor's offer to take the stand and to rebut Smith's testimony, the jury would likely infer that he had personal knowledge that Smith was not telling the truth.
 
 
 40
 We must therefore consider whether such misconduct was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Error is not harmless where "there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " Id. (quoting Fahy v. Connecticut, 375 U.S. 85, 86-7 (1963)). However, where " '[the] reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.' " United States v. Jones, 839 F.2d 1041, 1049 (5th Cir.), cert. denied, 486 U.S. 1024 (1988) (quoting Rose v. Clark, 478 U.S. 570, 579 (1986)).
 
 
 41
 The evidence against Anderson was overwhelming. Debra Jackson, Noel Jackson, and Marcia Grausam positively identified petitioner as the assailant. Their identifications were each based upon extended opportunities to view the assailant at close range. All three of them noted that Anderson's appearance differed at trial because he was wearing a mustache and a goatee.
 
 
 42
 Debra Jackson was able to provide the police with the license plate number of the car in which she and Marcia Grausam were abducted and assaulted. Ownership, or at least putative ownership, of the vehicle was attributed to Anderson, and was not denied. Hairs were discovered in the vehicle which were microscopically consistent with hairs from Debra Jackson's head. Seminal fluid was found on the back seat of the car. Blood typing tests showed that semen found on Marcia Grausam's clothing and vaginal smears could have come from petitioner. Anderson admitted that he fled the day after the attack to avoid questioning, and subsequently lived under an assumed name. Hence, substantial evidence was adduced at trial directly linking petitioner to the crimes for which he was convicted.
 
 
 43
 Additionally, it must be pointed out that Smith's evidence was not critical to the jury's deliberations. Smith was one of a number of witnesses who testified that petitioner wore a goatee and a mustache. His testimony was largely duplicative. Furthermore, Smith indicated that he did not see Anderson from May 12, 1976, until the date of trial. As the crimes in question took place between 2:30 and 6:00 on the morning of May 22, 1976, Smith was in no position to state definitively that petitioner had facial hair at that time. Accordingly, in light of the evidence presented at trial, petitioner's contention must be rejected.
 
 III.
 
 44
 Anderson next argues that the trial court's jury instruction on the elements of kidnapping served to deny him due process and equal protection of law.
 
 
 45
 In petitioner's case, the court gave the following instruction regarding the movement required to satisfy the asportation element of kidnapping
 
 
 46
 during the course of such confinement, the defendant must have forcibly moved the victims or caused them to be moved from one place to another for the purpose of abduction and kidnapping. If the evidence convinces you beyond a reasonable doubt that there was movement and that it was either for the purpose of abduction of the victims or to take the victims for the purpose of committing the crime of Criminal Sexual Conduct, then--that is sufficient for this element of the crime.
 
 
 47
 (Tr. 322-23) (emphasis added).
 
 
 48
 Anderson asserts that this instruction was erroneous because, in his view, movement of a victim which is merely incidental to the offense of criminal sexual conduct could not, under Michigan law, satisfy the asportation element of kidnapping. Thus, he claims that by eliminating from jury consideration an essential element of a charged offense, the trial court violated his right of due process.
 
 
 49
 Petitioner did not object to such an instruction being given at trial. In Michigan, "instructional error should not be considered on appeal unless the issue has been preserved by an objection to the instruction in the trial court." People v. Handley, 415 Mich. 356, 360 (1982). See also People v. Rand, 397 Mich. 638, 643 (1976). "Relief will be granted absent an objection only in cases of manifest injustice." People v. Kelly, 423 Mich. 261, 272 (1985). As a result of Anderson's state procedural default, we ordinarily would assess his claim of error under a "cause and prejudice" standard. See Harris v. Reed, 489 U.S. 255 (1989); Henderson v. Kibbe, 431 U.S. 145 (1977). We need not engage in such analysis here because we are persuaded that the asportation instruction was proper under Michigan law.
 
 
 50
 In People v. Adams, 389 Mich. 222 (1973), the Michigan Supreme Court "established the rule that movement, to be sufficient to meet the asportation requirement for kidnapping, must not be 'merely incidental' to an underlying lesser offense, 'it must be incidental to the commission of the kidnapping.' " People v. Barker, 411 Mich. 291, 299-300 (1981). Adams, however, left open whether such a holding also applied to offenses considered co-equal under Michigan law, such as criminal sexual conduct.
 
 
 51
 At the time of Anderson's trial, there was a "disagreement among [Michigan] Court of Appeals panels on the issue of whether the asportation element required for kidnapping may be incidental to another offense when the punishment for that offense is equal to that for kidnapping." Barker, 411 Mich. at 298 (footnote omitted). Compare People v. Worden, 71 Mich.App. 507, 513-14 (1976) (Adams held applicable to co-equal offenses of kidnapping and armed robbery) and People v. Hardesty, 67 Mich.App. 376 (1976) (concluding that Adams limited to situations where the underlying or other offense constituted a "lesser crime").
 
 
 52
 Three years after Anderson's trial, the Barker court determined that Adams was, in fact, applicable to situations involving co-equal offenses. However, as the trial court's asportation instruction was consistent with Michigan law at the time of petitioner's conviction, no due process violation is manifest.
 
 
 53
 The Michigan Supreme Court expressly limited the effect of Barker "to pending and future cases where the issue has been preserved." Barker, 411 Mich. at 302 n. 6. Since he is unable to obtain the benefit of the holding in Barker, Anderson contends that he has been deprived of equal protection of law. We do not see, however, how equal protection is implicated when a criminal defendant attempts to take advantage of a change in the law occurring after his conviction has been finalized. Consequently, we conclude that petitioner's argument lacks merit.
 
 IV.
 
 54
 Anderson next asserts that he was denied effective assistance of counsel when his trial attorney informed the jury of his criminal history, including a conviction for criminal sexual assault which was overturned, and his subsequent plea of guilty to a charge of attempted rape.
 
 
 55
 In order to be successful on his claim, Anderson must satisfy the stringent two-part standard set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984):
 
 
 56
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 57
 A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).
 
 
 58
 Revelation of a defendant's prior criminal acts before a jury is often damaging. Here, however, there is no question that mentioning Anderson's criminal history was a reasoned tactical decision. It was done to explain the potentially more harmful fact that petitioner fled to Georgia on the day after the attack to avoid questioning, and lived under an assumed name for over a year. Counsel may have thought that it would be better to elucidate the reasons for Anderson's flight before it was brought up by the prosecution. Those reasons had to do with petitioner's prior criminal history, which he himself alluded to in his testimony. He stated that he decided to leave Michigan, in part, because of "what had happened to the last case I was involved in, [he didn't] think [he] was treated fairly in that, and [he] didn't see any reason or any difference in the personalities that [he] was going to be dealing with that would make [him] feel as though [he'd] be treated any better this time." (App. 192.) Accordingly, we are convinced that the judgment call made by Anderson's counsel to refer to petitioner's criminal history did not constitute ineffective assistance of counsel. See Fornash v. Marshall, 686 F.2d 1179, 1188 (6th Cir.1982), cert. denied, 460 U.S. 1042 (1983).
 
 
 59
 Anderson also contends that he received ineffective assistance of counsel on direct appeal. In his view, appellate counsel should have raised the issues set out in the instant habeas petition, i.e., the prosecutor's questioning of Frank Smith, the kidnapping instruction, and the right to effective assistance of trial counsel. It is axiomatic, however, that tactical choices as to what issues to pursue on appeal "are properly left to the sound professional judgment of counsel...." United States v. Perry, 908 F.2d 56, 59 (6th Cir.), cert. denied, 498 U.S. 1002 (1990). Having determined that the arguments cited by Anderson were groundless as part of a habeas petition, we also believe there was a strong likelihood they would have been unsuccessful on direct appeal. As a result, we do not find that his appellate counsel was constitutionally ineffective.
 
 
 60
 AFFIRMED.